EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>    Recurrida<br><br>        v.<br><br>Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago<br><br>    Recurridos<br><br>Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced<br><br>    Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves;<br>Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Nuñez y su Secretaria Ayleen Figueroa Vázquez<br><br>    Peticionarios | | 2017 TSPR 57<br><br>197 ____ |

Número del Caso: CT-2017-2


Fecha: 19 de abril de 2017


Abogados de los Peticionarios


    Lcdo. Israel Roldán González
    Lcdo. Carlos Santiago Tavarez
    Lcdo. Eliezer Aldarondo Ortiz
    Lcda. Maria Elena Vázquez Graziani
    Lcdo. Claudio Aliff Ortiz
    Lcda. Rosa Campos Silva
    Lcdo. Hamed Santaella Carlo

Abogados de los Recurridos

    Lcdo. Manuel Izquierdo Encarnación
    Lcdo. Héctor E. Pabón Vega
    Lcdo. Gerardo De Jesús Annoni
    Lcdo. Luis Enrique Romero
    Lcdo. Liany Vega Nazario
    Lcdo. Nelson Rodríguez Vargas


Oficina del Procurador General

    Lcdo. Luis Román Negrón
    Lcdo. Isaías Sánchez Báez


Materia: Derecho Constitucional. Revocación de lo resuelto en P.P.D. v. Gobernador II, 136 DPR 916 (1994). No procede aplicar la veda electoral dispuesta en la Ley Electoral de 2011 al plebiscito que se celebrará conforme la Ley para la descolonización inmediata de Puerto Rico, Ley Núm. 7 de 2017.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista | | *Certificación Intrajurisdiccional* |
| Recurrida | | |
| v. | CT-2017-002 | |
| Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago | | |
| Recurridos | | |
| Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced | | |
| Recurridos | | |
| Senado de Puerto Rico, por conducto de su Presidente Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves; Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Nuñez y su Secretaria Ayleen Figueroa Vázquez | | |
| Peticionarios | | |

*PER CURIAM*

En San Juan, Puerto Rico, a 19 de abril de 2017.

> Si para llegar a una correcta decisión de este caso es necesario modificar las opiniones dictadas anteriormente por este Tribunal, que se modifiquen de cualquier modo, o que se anulen, si fuere necesario. Al error no se le puede nunca convertir en verdad, por más que se insista en él; si se ha seguido un camino equivocado, volvamos sobre nuestros pasos antes de que nos perdamos en el laberinto de los engaños; atrevámonos a proceder correctamente. *Giménez et al. v. Brenes*, 10 DPR 128 (1906) (Opinión disidente del ex Juez Asociado MacLeary).

El recurso de certificación intrajurisdiccional ante nuestra consideración, en el que se nos solicita que determinemos si la veda electoral dispuesta en el Artículo 12.001 de la Ley Electoral de 2011, *infra*, es de aplicación a escenarios electorales distintos a los establecidos por la Asamblea Legislativa, nos brinda la oportunidad de reexaminar los pronunciamientos errados que realizamos en el caso *P.P.D. v. Gobernador II*, 136 DPR 916 (1994), y corregirlos.

En dicho caso, una mayoría de este Tribunal violó los principios más básicos de hermenéutica, autolimitación judicial y separación de poderes al interpretar el Artículo 8.001 de la Ley Electoral del 1977, *infra*, y extender la veda electoral gubernamental allí dispuesta a escenarios electorales no contemplados por la Asamblea Legislativa.

Por ello y por los fundamentos que expondremos a continuación, revocamos la norma establecida en *P.P.D. v. Gobernador II,* supra*,* y resolvemos, al amparo de un profundo análisis estatutario, que ni los plebiscitos ni los referéndums están incluidos dentro del concepto de "elección general" establecido en el Artículo 12.001 de la Ley Electoral de 2011, *infra*.

Con ello en mente, pasaremos a delinear los hechos que dieron génesis a la controversia de autos.

**I**

El 3 de febrero de 2017, la Asamblea Legislativa aprobó la *Ley para la Descolonización Inmediata de Puerto Rico* (Ley para la Descolonización), Ley Núm. 7-2017. En virtud de dicho estatuto, se autorizó la celebración de un Plebiscito el 11 de junio de 2017, para elegir entre varias alternativas de estatus político. También, la referida ley dispone para la celebración de un Referéndum el 8 de octubre de 2017, si prevalece una de dichas alternativas.[1]

El 13 de febrero de 2017, la Comisión Estatal de Elecciones (CEE) celebró una reunión ordinaria. En dicha

---

[1] Al momento de la certificación de esta Opinión *Per Curiam*, la Ley para la Descolonización, *supra*, está siendo objeto de varias enmiendas relacionadas a las alternativas de estatus político de Puerto Rico que serán incluidas en el Plebiscito. Sin embargo, nada de ello altera lo que hoy resuelve este Tribunal en cuanto a la aplicación de la veda electoral a escenarios electorales distintos al establecido por la Asamblea Legislativa en el Artículo 12.001 de la Ley Electoral de 2011, *infra*.

reunión, el Comisionado Electoral del Partido Popular Democrático (PPD) presentó una solicitud para la activación de la Junta Examinadora de Anuncios (JEA), mientras culminaba el proceso plebiscitario. La Comisionada Electoral del Partido Nuevo Progresista (PNP) se opuso a dicha solicitud, por entender que, según el Artículo 12.001 de la *Ley Electoral de Puerto Rico* (Ley Electoral de 2011), Ley Núm. 78-2011, 16 LPRA sec. 4231, la veda electoral y la JEA solo procedían durante las elecciones generales y no en plebiscitos ni en referéndums.

Ante la falta de unanimidad entre los Comisionados Electorales, la controversia fue sometida a la consideración de la presidenta de la CEE, quien el 1 de marzo de 2017, emitió la Resolución Núm. CEE-RS-17-07. Allí, sostuvo que el Artículo XIII de la Ley para la Descolonización, *supra,* establecía que en el Plebiscito aplicarían las prohibiciones contenidas en el Capítulo XII de la Ley Electoral de 2011, *supra, y* reconoció que, entre estas, se encontraba la prohibición para la difusión pública gubernamental dispuesta en el referido Artículo 12.001, *supra,* también conocida como veda electoral. A base de dicha interpretación, la Constitución de Puerto Rico y lo resuelto por este Tribunal en *P.P.D. v. Gobernador II,* supra, activó la veda electoral y ordenó la constitución de la JEA. Según la Resolución, la prohibición perduraría hasta el 12 de junio de 2017 y, de

ser necesaria la celebración del Referéndum, hasta el 9 de octubre de 2017.

Tras habérsele denegado una oportuna moción de reconsideración, la Comisionada del PNP presentó un recurso de revisión judicial ante el Tribunal de Primera Instancia, en el que reiteró que las disposiciones contenidas en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, eran solamente aplicables a las elecciones generales. Además, presentó una solicitud de auxilio de jurisdicción, con el propósito de que se paralizaran los efectos de la Resolución impugnada, hasta tanto se atendiera el recurso de revisión. Por último, incluyó como partes indispensables en el pleito al Gobierno de Puerto Rico y a los dos cuerpos legislativos.

Mientras el caso estaba pendiente ante el foro primario, el Senado de Puerto Rico y la Cámara de Representantes, por conducto de sus correspondientes presidentes y secretarios (en conjunto, peticionarios), presentaron el recurso de certificación intrajurisdiccional que nos ocupa. Solicitaron que resolvamos, como cuestión de derecho, si la veda electoral dispuesta en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, puede aplicarse al proceso plebiscitario a celebrarse el 11 de junio de 2017. En la misma fecha, compareció la Comisionada Electoral del PNP para unirse al recurso de certificación presentado.

El 30 de marzo de 2017, expedimos el recurso y ordenamos a las partes presentar sus respectivos alegatos.

En su alegato, los peticionarios reiteraron que la presidenta de la CEE se había extralimitado en sus facultades, pues la veda electoral solamente aplicaba a las elecciones generales. Apoyaron su contención en la diferencia que existía entre los distintos procesos eleccionarios, a saber: "elección general", "plebiscito" y "referéndum", según definidos por la Ley Electoral de 2011, *supra*. Arguyeron que tanto el texto del Artículo 12.001 de la Ley Electoral de 2011, *supra,* como el texto del *Reglamento para el Control de Gastos de Difusión Pública del Gobierno* únicamente aludían al término "elección general". En vista de ello, insistieron en que tanto los "referéndums" como los "plebiscitos" quedaban fuera del ámbito de aplicación del referido Artículo.

Por su parte, la Comisionada del PNP añadió, entre otras cosas, que la Ley para la Descolonización, *supra*, disponía que aplicarían al Plebiscito las prohibiciones y delitos de la Ley Electoral de 2011, *supra*, excepto cuando estas fueran incompatibles e improcedentes con la misma ley. Así, concluyó que la prohibición para la difusión pública gubernamental estatuida en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, no podía aplicarse al Plebiscito, pues era improcedente e incompatible con la Ley para la Descolonización, *supra*.

Asimismo, el Procurador General compareció en representación del Gobierno de Puerto Rico. En primer lugar, señaló que el Gobierno tenía el deber de informar a la ciudadanía, máxime cuando se trataba de asuntos de alto interés público. Adujo que este deber de informar, el cual la presidenta de la CEE pretendía socavar, estaba intrínsecamente ligado al ejercicio de la libertad de expresión de los ciudadanos. En segundo lugar, recalcó que la veda electoral contenida en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, únicamente aplicaba a las elecciones generales. Enfatizó que la propia Ley Electoral de 2011, *supra,* definía como "elección" aquella que incluía las "elecciones generales", los "plebiscitos" y los "referéndums", *inter alia*. Por consiguiente, sostuvo que cuando la Asamblea Legislativa limitó el texto del Artículo 12.001 de la Ley Electoral de 2011, *supra,* a "elección general", inequívocamente había excluido de su ámbito de aplicación tanto las consultas plebiscitarias como los referéndums.

Además, el Procurador General planteó que lo resuelto en *P.P.D. v. Gobernador II,* supra, era inaplicable al caso de autos. En la alternativa, arguyó que este Tribunal debía reevaluar el análisis y alcance de la norma allí esbozada, en aras de evitar que se perpetuara un error doctrinal. Por último, indicó que el hecho de que no se aplicara la veda electoral al Plebiscito, no significaba que el Gobierno podría gastar los fondos ilimitadamente. Destacó que al

amparo de la Sección 9 del Artículo VI de la Constitución de Puerto Rico, *infra*, cualquier parte con legitimación activa, que entendiera que el Gobierno de Puerto Rico estuviese utilizando fondos públicos para fines no públicos, podía acudir a los tribunales a vindicar sus derechos.

Por su parte, los opositores al recurso, a saber, la CEE, el Comisionado Electoral del PPD y la Comisionada Electoral del Partido Independentista Puertorriqueño defendieron la corrección de la Resolución de la CEE en todas sus partes. Primero, arguyeron que la Sección 1 del Artículo XIII de la Ley para la Descolonización, *supra,* incorporó por referencia la Sección de Delitos y Prohibiciones de la Ley Electoral de 2011, *supra,* en su totalidad. Segundo, enfatizaron que lo resuelto por este Tribunal en *P.P.D. v. Gobernador II, supra*, disponía de la controversia. Concluyeron que el principio constitucional de igualdad económica entre los partidos justificaba la veda electoral decretada.

Habiendo examinado las posiciones de todas las partes en torno a la controversia que nos ocupa, procedemos a resolver.

## II

La doctrina del *stare decisis* establece que, como norma general, un tribunal debe seguir sus decisiones en casos posteriores, a fin de lograr estabilidad y

certidumbre legal. *Pueblo v. Díaz De León*, 176 DPR 913, 921 (2009); *Am. R.R. Co. of P.R. v. Comision Indus. de P.R. y Angueira*, 61 DPR 314, 326 (1943). No obstante, dicha doctrina "no llega al extremo de declarar que la opinión de un tribunal tenga el alcance de un dogma que deba seguirse ciegamente aun cuando el tribunal se convenza posteriormente que su decisión anterior es errónea". *Am. R.R. Co. of P.R. v. Comision Indus. de P.R. y Angueira*, supra. Véase, además, *Pueblo v. Sánchez Valle*, 192 DPR 594, 645 (2015). "El propósito inspirador de la doctrina de *stare decisis* es lograr estabilidad y certidumbre en la ley, **mas nunca perpetuar errores**". *Am. R.R. Co. of P.R. v. Comision Indus. de P.R. y Angueira,* supra*, pág. 326. (Énfasis suplido). Así, cuando el razonamiento de una de nuestras decisiones **ya no resiste un análisis cuidadoso**, no estamos obligados a seguirlo. *Rivera Ruiz v. Mun. de Ponce*, 2016 TSPR 197, 196 DPR ___ (2016); *Pueblo v. Díaz De León*, supra, pág. 922. En ese sentido, hemos identificado tres circunstancias que, como excepción, justifican dejar a un lado un precedente: "(1) si la decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". *Rivera Ruiz v. Mun. de Ponce*, supra; *Pueblo v. Sánchez Valle*, supra, págs. 645-646.

"**El primero de estos principios dispone de la cuestión planteada**". *Pueblo v. Sánchez Valle*, supra, pág. 646. Sin

lugar a dudas, el caso *P.P.D v. Gobernador II*, supra, es claramente erróneo. Así lo demostramos a continuación.

### III

En agosto de 1994, la Asamblea Legislativa aprobó la *Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994* (Ley Habilitadora del Referéndum), Ley Núm. 49-1994, 16 LPRA sec. 956 (Suprimida). Mediante esta, se autorizó la celebración de un Referéndum para que los electores inscritos expresaran su aprobación o rechazo a varias enmiendas propuestas a la Constitución de Puerto Rico.

Con el propósito de impugnar la constitucionalidad de dicha Ley y de solicitar que se le ordenara al entonces Gobernador de Puerto Rico, Hon. Pedro Rosselló González, que detuviera las campañas publicitarias en los medios de difusión pública del país, se presentaron varias demandas en contra del Gobierno de Puerto Rico y el entonces Gobernador.

Tras varios incidentes procesales, el Tribunal de Primera Instancia resolvió que el Artículo 8.001 de la *Ley Electoral de Puerto Rico de 1977* (Ley Electoral de 1977), Ley Núm. 4 de 20 de diciembre de 1977, 16 LPRA sec. 3351 (ed. 2009) -el cual prohibía a las agencias del Gobierno que incurrieran en gastos para la difusión pública "a partir del 1ro. de enero del año en que deba celebrarse una **elección general** y hasta el día siguiente a la fecha de

celebración de la misma"-, era de aplicación al Referéndum. Así, ordenó a la CEE a nombrar la JEA, para que evaluara la necesidad de publicación de todo anuncio gubernamental hasta el día del Referéndum. Fundamentó su razonamiento en que la Ley Habilitadora del Referéndum disponía que la Ley Electoral de 1977, *supra*, aplicaría supletoriamente, en todo aquello que fuera necesario, pertinente y compatible a sus propósitos. Además, se basó en el principio de igualdad económica electoral presuntamente inmerso en la Constitución de Puerto Rico.

Inconformes, el Gobierno de Puerto Rico y la Compañía de Turismo recurrieron ante este Tribunal y plantearon, entre otros asuntos, que el foro primario erró al aplicar la veda electoral dispuesta en el referido Artículo 8.001 de la Ley Electoral de 1977, *supra*, al Referéndum, ya que de esa forma se daba al traste con la intención legislativa.

Así las cosas, quedó sometida para la consideración de este Tribunal la siguiente controversia: si era **la voluntad e intención de la Asamblea Legislativa** que aplicara al Referéndum la veda electoral estatuida en el referido Artículo 8.001, *supra*, para las elecciones generales. En consecución de dicho objetivo, el Tribunal debía hacer un análisis exhaustivo tanto de la Ley Habilitadora del Referéndum, *supra*, como de la Ley Electoral de 1977, *supra*. Ello, pues es un principio de hermenéutica reconocido que para conocer la intención legislativa es necesario analizar

la ley, y "al analizar[la] **se debe acudir primero** al propio texto, pues si el lenguaje es claro y libre de ambigüedad, no debe ser menospreciado bajo el pretexto de cumplir con su espíritu". *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 668 (2014). Veáse, además, *S.L.G. Sola-Maldonado v. Bengoa Becerra*, 182 DPR 675, 691 (2011); *Morell Corrada v. Ojeda*, 151 DPR 864, 877 (2000); Artículo 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14.

Sin embargo, en el caso *P.P.D. v. Gobernador II*, *supra*, una mayoría de este Tribunal omitió hacer un análisis profundo de las disposiciones legales en controversia. En vez, y sin que ninguno de los peticionarios impugnara la constitucionalidad de las referidas disposiciones, confirmó la determinación del foro primario al amparo de un análisis exclusivamente constitucional. Específicamente y en lo pertinente, expresó lo siguiente:

> Resumiendo, bajo el principio constitucional de igualdad económica que permea todo sufragio -que el Estado viene llamado a garantizar y que este Tribunal tiene que proteger al amparo de la Sec. 2 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, procede que extendamos la prohibición que contiene el Artículo 8.001 de la Ley Electoral de Puerto Rico, *supra, y* la apliquemos a este caso para evitar que el Estado, mediante anuncios gubernamentales, pueda tener una influencia en la libre expresión de los ciudadanos en la votación, con el poder económico que éste tiene mediante la utilización de fondos públicos. *P.P.D v. Gobernador II*, supra, págs. 926-927.

De lo transcrito surge que este Tribunal no auscultó la intención de la Asamblea Legislativa y buscó en la Constitución de Puerto Rico los fundamentos para resolver lo que le pareció adecuado. Dicho análisis fue incorrecto.

Para empezar, esa forma de proceder infringió la norma de autolimitación judicial de que "[c]uando se puede resolver un asunto mediante un análisis estatutario, se hace innecesario considerar el aspecto constitucional". *P.P.D. v. Admor. Gen. de Elecciones*, 111 DPR 199, 243, esc. 32 (1981). Véase, además, *Pacheco v. Srio. Instrucción Pública*, 108 DPR 592, 601 (1979) (allí se razonó que cuando las partes no plantean el aspecto de la validez constitucional de un estatuto, el Tribunal no está justificado a pronunciarse sobre el particular). El hecho de que este Tribunal sea el máximo intérprete de la Constitución de Puerto Rico no le da carta blanca para que acuda a esta ilimitadamente, sin la correspondiente solicitud de las partes.

Además, la actuación del Tribunal infringió la doctrina de separación de poderes. Sobre el particular, los tratadistas Bernier y Cuevas Segarra han expresado lo siguiente:

> Bajo un sistema de separación de poderes como el que funciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. En el desempeño normal de sus funciones, los tribunales están

obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. **Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la Rama Judicial de las prerrogativas de la Rama Legislativa.** Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo **por sus propios conceptos de lo justo, lo razonable y lo deseable.** R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes de Puerto Rico, 2da. ed. San Juan, Publicaciones JTS, 1987, Vol. I, pág. 299.[2] (Énfasis suplido).

Por otro lado, no tan solo este Tribunal acudió a la Constitución de Puerto Rico cuando no debió hacerlo, sino que llevó a cabo un análisis constitucional sumamente desacertado, el cual discutimos a continuación en dos partes.

A.

Primero, el Tribunal hizo referencia a la Sección 2 del Artículo II de la Constitución de Puerto Rico, la cual dispone que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Artículo II, Sec. 2, Const. PR, LPRA, Tomo 1. En específico, razonó que "en protección del derecho

---

[2] Véase, además, Ponencia del ex Juez Presidente del Tribunal Supremo, Hon. Federico Hernández Denton, *La separación de poderes y la interpretación constitucional en Puerto Rico*, XIII Encuentro de Presidentes y Magistrados de los Tribunales Constitucionales y de las Salas Constitucionales de América Latina, México, 2006, págs. 8-9. Disponible en: http://www.scribd.com/doc/51523764/La-Separación-de-Poderes-y-la-Interpretación-Constitucional-en-Puerto-Rico-2006 (accedido, 10 de abril de 2017).

constitucional a la libre selección traducido en el derecho al sufragio", debía aplicar la veda electoral al Referéndum. *P.P.D v. Gobernador II*, supra, pág. 926. Con dicho razonamiento, este Tribunal presumió, **sin prueba de algún anuncio gubernamental**, que el Gobierno de Puerto Rico coaccionaría a los electores durante el Referéndum, mediante la difusión pública. Sin embargo, eso no lo podía presumir el Tribunal. Por considerarlas completamente acertadas, nos hacemos eco de las expresiones emitidas por el ex Juez Asociado Rebollo López en su opinión disidente en el caso *P.P.D. v. Gobernador II*:

> Somos los primeros en admitir que siempre existe *la posibilidad* de que la Rama Ejecutiva del Gobierno de Puerto Rico —*en un momento determinado de nuestra historia de pueblo, presente o futuro, y en relación con un evento electoral*— pueda *intentar* violar el referido axioma de igualdad y coaccionar a la ciudadanía en su prerrogativa electoral.

> Ahora bien, *ello no lo puede presumir la Rama Judicial*; esto es, estamos obligados a partir de la premisa de que la Rama Ejecutiva, de cualquier administración de Gobierno, actúa correctamente y conforme a los dictados pertinentes de la Constitución y de las leyes aplicables al asunto ante nuestra consideración. En otras palabras, la parte que alegue y sostenga que así no lo ha hecho la Rama Ejecutiva tiene el peso de probarlo en una vista judicial plenaria. *Íd.*, pág. 936. (Énfasis en el original).

Es decir, el Tribunal no podía especular sobre la futura actuación gubernamental. Ciertamente, no negamos que los derechos consagrados en la Sección 2 del Artículo

II de la Constitución de Puerto Rico, *supra*, existen y deben ser protegidos tanto en las elecciones generales, como en los referéndums y los plebiscitos. Sin embargo, ello no justifica que dichos derechos se intenten proteger prematuramente y sin prueba de la que surja que fueron violados. Dicha prueba no fue presentada por las partes en el caso, por lo que este Tribunal erró al vindicar los mencionados derechos a destiempo.

B.

Por otra parte, la mayoría del Tribunal en P.*P.D v. Gobernador II*, supra, se fundamentó en el "axioma de igualdad [económica entre los partidos] presuntamente inmerso en la Constitución". Sin embargo, **dicho axioma no existe en la Constitución.** Sobre el particular, el profesor Luis M. Villaronga expresó muy acertadamente lo siguiente:

> Como es sabido "axioma" significa una "[a]firmación tan evidente que es admitida por todos sin necesidad de demostración". 1 María Moliner, Diccionario de uso del español 318 (1986). **Ni la Constitución de Puerto Rico ni la de los Estados Unidos contienen tal [principio de igualdad económica] respecto a personas en general y mucho menos respecto a los partidos políticos.** L. M. Villaronga, *Derecho Constitucional*, 66 Rev. Jur. UPR 391, 402, esc. 48 (1997). (Énfasis suplido).

Ello lo reconoció este Tribunal en el caso *Marrero v.*
*Mun. de Morovis*, 115 DPR 643, 646 (1984),[3] al expresar lo
siguiente:

> Al presente, en materia electoral no se
> cuestiona seriamente el postulado de igualdad
> inmerso en nuestra Constitución. Históricamente
> ese ideal ha cobrado vida en el esquema integral
> financiero trazado por la Asamblea Legislativa
> para lograr paridad económica entre los partidos
> políticos y los candidatos. Este plan fue
> originalmente descrito en la Asamblea
> Constituyente por el delegado señor Padrón
> Rivera. Abogó por el día en que 'si queremos
> unas elecciones fundamentalmente democráticas--
> tenemos que llegar a la conclusión de que los
> partidos políticos deben ponerse en un mismo
> nivel de potencialidad económica para que los
> candidatos tengan la misma oportunidad de llegar
> al poder.... Y el Estado debe tener la
> obligación de poner en las mismas condiciones
> económicas a todos los candidatos para que el
> proceso electoral entrañe puramente, el
> principio democrático'. (Énfasis suplido.) 2
> Diario de Sesiones de la Convención
> Constituyente 1401 (1952). **Aunque esa aspiración
> no alcanzó linaje constitucional**,
> posteriormente, en virtud de la Ley Núm. 110 del
> 30 de junio de 1957 --hoy derogada-- **tuvo
> alumbramiento estatutario**. (Énfasis suplido).

En ese sentido, resulta pertinente destacar que el ex
Juez Asociado Negrón García, quien emitió la Opinión del
Tribunal en la que, por primera vez, se hizo referencia al
mal llamado "axioma",[4] posteriormente admitió lo siguiente

---

[3] Paradójicamente, el caso *Marrero v. Mun. de Morovis, supra, fue
citado por la mayoría del Tribunal en el caso P.P.D. v. Gobernador II,
supra,* para sostener la existencia del mal llamado axioma
constitucional.

[4] El profesor José Julián Álvarez documenta lo siguiente sobre la
primera manifestación del "axioma":

en su opinión concurrente del caso *P.S.P. v. Srio. de Hacienda*, 110 DPR 313, 321 (1980) (Sentencia), a la que se le unieron los ex Jueces Asociados Dávila e Irizarry Yunqué:

> Resueltas estas cuestiones preliminares y despejada la vía procesal, diri[g]imos nuestra atención a la médula del recurso: la validez del Art. 3.017.
>
> A manera de introito, este precepto forma parte integral del esquema financiero legislativo trazado para lograr paridad económica entre los partidos políticos del país. Este plan fue originalmente descrito en la Asamblea Constituyente por el delegado Sr. Padrón Rivera, quien abogó por el día en que 'si queremos unas elecciones fundamentalmente democráticas -- tenemos que llegar a la conclusión de que los partidos políticos deben ponerse en un mismo nivel de potencialidad

---

P.R.P. [v. ELA, 115 DPR 631 (1984)] es uno de la larga lista de los casos en los que el Tribunal se ha referido a un **supuesto** "axioma" o "postulado" de igualdad entre los partidos políticos. […]. Es interesante trazar el origen de ese "axioma". Su primera manifestación fue una opinión del Tribunal emitida por el Juez Negrón García, *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976). El PNP cuestionaba una orden del Tribunal Electoral para inspeccionar sus libros y otros documentos relativos a sus finanzas. El Tribunal concluyó que el organismo electoral deseaba inspeccionar las finanzas de todos los partidos y sostuvo la orden. Para justificarla, halló apoyo en el Código Electoral y manifestó:

> Es válido el axioma básico que fluye en el Código Electoral de que el proceso político decisional puertorriqueño responda en su realidad al mandato de igualdad consagrado en nuestra Ley Fundamental; ello se logra imponiendo limitaciones al monto de contribuciones político-partidistas. La constancia, preservación y presentación de data e informes sobre el particular, y la oportuna intervención y contabilidad de los mismos, son consecuencia natural e imprescindible para garantizar el cumplimiento de los límites legales establecidos en materia de finanzas políticas.

Obviamente, el Tribunal resolvió que la ley se *justificaba* porque perseguía el ideal de igualdad, no que sus preceptos estuvieran *compelidos* por ese ideal. J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, ed. Temis, 2009, págs. 965-966. (Énfasis en el original).

económica para que los candidatos tengan la misma oportunidad de llegar al poder .... Y el Estado debe tener la obligación de poner en las mismas condiciones económicas a todos los candidatos para que el proceso electoral entrañe puramente, el principio democrático'. Diario de Sesiones, pág. 1401. **Aunque este deseo no alcanzó linaje constitucional**, posteriormente, en virtud de la Ley Núm. 110 del 30 de junio de 1957 --hoy derogada-- **tuvo alumbramiento estatutario**. (Énfasis suplido).

Es decir, no hay duda que el principio de igualdad económica entre los partidos no es de estirpe constitucional. Ahora bien, corresponde cuestionarse si, a través de la Ley Núm. 110 del 30 de junio de 1957, (1957 Leyes de Puerto Rico 535-541), la cual se aprobó para establecer el Fondo Electoral, la Asamblea Legislativa estableció un principio universal que aplicara, no tan solo a la misma Ley Núm. 110, *supra*, sino a todas las leyes que se aprobaran en el futuro. La respuesta a esta interrogante es en la negativa.

La Asamblea Legislativa, en la Exposición de Motivos de la Ley Núm. 110, *supra*, expresó **únicamente sus razones para establecer el Fondo Electoral**. Específicamente y en lo pertinente, indicó:

> Es principio universalmente reconocido que los partidos políticos son instrumentos necesarios a la democracia para que a través de ellos el pueblo pueda respaldar programas y expresar mandatos con relación a su gobierno. Todos los partidos democráticos, mayoría y minoría, cumplen estas funciones: los de la mayoría en respaldo a la obra de gobierno que representa la opinión mayoritaria, pero que debe ser llevada a cabo en beneficio de todo el

pueblo, sin distinción partidista; los de la minoría para que expresen el punto de vista de otra parte del pueblo con miras a tratar de convencer a una mayoría de ciertos fines distintos en ciertas formas diferentes, y velar porque el programa respaldado por la mayoría sea en efecto administrado con igualdad para todos.

Por tales razones, es de profundo interés público el que los partidos políticos puedan estar libres de control por fuerzas económicas, privadas o gubernamentales, que al hacerse necesarios para el financiamiento de las actividades legitimas normales de los partidos políticos, puedan adquirir sobre ellos un control o influencias contrarios a la idea democrática, a la libertad política del pueblo en general y el funcionamiento genuino de la democracia.

Es por eso que la asamblea legislativa considera sabio el que por una parte, se prohíban grandes contribuciones financieras a los partidos políticos, y, por otra, se les provea a estos organismos democráticos de algunos fondos adecuados para el cumplimiento de sus funciones más esenciales, independientemente del deber que cada ciudadano tiene de contribuir al sostenimiento de su colectividad política con pequeñas cantidades compatibles con sus ingresos y con las normas que cada partido adopte dentro de los propósitos y fines de esta ley.

De lo transcrito, solamente surge la preocupación de la Asamblea Legislativa de que los partidos políticos estuvieran a merced de las fuerzas económicas, la cual atendió con la creación del Fondo Electoral. De ninguna parte se desprende el principio de que todos los partidos debían ser iguales en materia económica. Por tanto, no es correcto seguir aplicando un principio **universal** e **ilimitado** de igualdad económica entre los partidos

políticos, que no fue establecido en tantas palabras por la Asamblea Legislativa al aprobar la Ley Núm. 100, *supra*.

Sin embargo, este Tribunal, en *P.P.D. v. Gobernador II*, supra, aplicó dicho principio automáticamente y lo elevó a rango constitucional. Ello se debe a que "[a] través de los años ha surgido una tendencia a ver la Constitución, no en sus propios términos, sino a transformarla en un documento político en apoyo de una postura". R. Martínez Torres, *El originalismo como método de interpretación constitucional y el principio de separación de poderes*, 49 Rev. Jur. UIPR 249, 249 (2015). Ciertamente, "se ha utilizado la facultad de la Rama Judicial de ser la máxima intérprete de la Constitución para extender indebidamente el significado de ese documento magno, **con el propósito de inventarse derechos inexistentes**, sin tener que aprobar una ley a esos efectos ni enmendar la Constitución". *Íd.*, págs. 249-250. (Énfasis suplido).

Por último, además de constitucionalizar indebidamente el presunto "principio", la mayoría del Tribunal en *P.P.D. v. Gobernador II*, supra, constitucionalizó la veda electoral y la JEA, a pesar de que estas son de creación estatutaria. Es decir, creó el derecho constitucional a que se aplique la veda y se active la JEA en procesos electorales distintos al que la Asamblea Legislativa claramente contempló en el Artículo 8.001 de la Ley Electoral de 1977, *supra*. Esto, para

evitar que el Gobierno, mediante la utilización de fondos públicos en anuncios gubernamentales, pudiera ejercer una influencia en la votación de los ciudadanos durante el Referéndum.

Ahora bien, este Tribunal no tenía que elevar a rango constitucional disposiciones estatutarias para atender la mala utilización gubernamental de fondos públicos fuera del año en que se celebran las elecciones generales. Ciertamente, el Tribunal ignoró la existencia de la Sección 9 del Artículo VI de la Constitución de Puerto Rico, el cual establece que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Artículo VI, Sec. 9, Const. de PR, *supra*. Mediante dicha disposición, nuestra Asamblea Constituyente atendió la preocupación del mal uso gubernamental de fondos públicos durante todo el cuatrienio. En ese sentido y en virtud de que el Artículo 8.001 de la Ley Electoral del 1977, *supra*, solo aplicaba a las elecciones generales, las partes en el caso *P.P.D. v. Gobernador II*, *supra*, debieron haber presentado, de tener prueba para ello, un *injunction* para vindicar sus derechos al amparo de la referida Sección 9 de la Constitución de Puerto Rico, *supra*.

**IV**

Del anterior análisis surge con total claridad que la normativa establecida en *P.P.D. v. Gobernador II*, supra, es

claramente errónea y debe revocarse. Sin embargo, la opinión disidente de este Tribunal pretende evadir este resultado por "la difícil situación fiscal". Ello dista de lo que debe motivar la revocación de una norma. Si la norma es errónea, no debemos "dudar en rectificar y dejar[la] sin efecto", pues no estamos "investidos del don de la infalibilidad". *Rondón v. The Aetna Cas. & Sur. Co.*, 56 DPR 439, 456 (1940). "Persistir en el error para realzar la consistencia de lo decidido constituiría una abdicación del deber que tenemos, como tribunal apelativo, de impartir justicia y de pautar el derecho". *Reyes Corano v. Dir. Ejecutivo*, 110 DPR 40, 42 (1980).

En virtud de dicho deber, a continuación, procederemos a examinar si fue la intención de la **Asamblea Legislativa** –no la nuestra–, que las disposiciones del Artículo 12.001 de la Ley Electoral de 2011, *supra*, aplicaran a la consulta de estatus que autoriza la Ley para la Descolonización, *supra*. Para lograr dicho objetivo, aplicaremos lo que corresponde en derecho, sin sujeción al erróneo precedente.

**V**

**A.**

De conformidad con la doctrina de separación de poderes, no podemos perder de perspectiva que nuestra función es determinar qué quiso decir el legislador y no qué nosotros hubiéramos querido que se dijera. *Aquino González v. AEELA*, 182 DPR 1, 39 (2011); R.E. Bernier y

J.A. Cuevas Segarra, *op. cit.,* pág. 241. Para cumplir con esa función, "los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes secciones". *Aquino González v. AEELA*, supra, pág. 40. Así, debemos interpretar íntegramente las disposiciones de la ley y no de manera aislada. *Íd.;* R.E. Bernier y J.A. Cuevas Segarra, *op. cit.*, pág. 315. **La interpretación que le demos finalmente al precepto legal no puede conllevar el absurdo de dejar sin efecto —o sin sentido coherente- otras disposiciones de la ley ante nuestra consideración**. Véase *Cabassa v. Bravo*, 21 DPR 185, 186 (1914) ("debemos interpretar la ley dándole efecto a todas sus disposiciones sin omitir ninguna"); véase, además, *López Rosas v. CEE*, 161 DPR 527, 535-536 (2004). Esta norma está predicada en la armoniosidad que deben presentar las disposiciones de la ley —y la ley en sí- ante nuestra consideración. Después de todo, no podemos presumir que la Asamblea Legislativa promulgó una ley con disposiciones inconsistentes.

Por otro lado, sabido es que el texto claro e inequívoco de la ley constituye la expresión por excelencia de la intención del legislador. *Romero Barceló v. ELA*, 169 DPR 460, 476-477 (2006); *Alejandro Rivera v. ELA*, 140 DPR 538, 544-545 (1996). Cuando estamos ante una ley que cumple con esta característica, no podemos menoscabar la expresión del Asamblea Legislativa, so pretexto de cumplir con la intención legislativa. Artículo 14 del Código Civil de Puerto Rico, *supra*. ("Cuando la ley es clara libre de toda

ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu"); *Romero Barceló v. ELA,* supra, pág. 477 ("cuando una ley es clara y no es ambigua *no hay necesidad de mirar más allá de la letra en búsqueda de la intención legislativa*"); *Atlantic Pipe Corp. v. FSE*, 132 DPR 1026, 1030 (1993). Ante este postulado, no podemos incluir escenarios en un estatuto que no están dentro de la razón del precepto en cuestión. R.E. Bernier y J.A. Cuevas Segarra, *op. cit.*, pág. 246.[5] Por lo tanto, "[d]ebemos descubrir y darle efecto a la intención expresada mediante la letra de la ley". *Romero Barceló v. ELA,* supra, pág. 477.

Asimismo, "[c]uando el lenguaje de la ley es claro e inequívoco, nuestra responsabilidad es respetar la voluntad legislativa, independientemente de nuestro criterio personal". *Delgado Hernández, Ex Parte*, 165 DPR 170, 192 (2005), haciendo referencia a *Alonso García v. SLG*, 155 DPR 91 (2001); *Lasalle v. Junta Dir. ACAA*, 140 DPR 694 (1994); *Silva v. Adm. Sistemas de Retiro*, 128 DPR 256 (1991). Es decir, al interpretar la ley, los tribunales deben abstenerse "de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable". *Aquino González v. AEELA*, supra, pág. 40. "[E]sto requiere de los tribunales de justicia el mayor grado de disciplina al aplicar una ley". *Sánchez Díaz v. ELA*, 181 DPR 810, 822

---

[5] Véase *Morales Torres v. Tribunal Superior*, 99 DPR 459 (1970); *Cardona v. Com. Industrial*, 57 DPR 397, 399 (1940).

(2011). Después de todo, la Asamblea Legislativa es la llamada a "determinar cuál deb[e] ser la política pública que encarnen nuestras leyes". *Delgado Hernández, Ex Parte*, supra, pág. 192. Consecuentemente, "[e]l juzgador no puede sustituir su sentido de justicia por la letra clara del estatuto". *Delgado Hernández, Ex Parte*, supra, pág. 193; *Berrocal v. Tribunal de Distrito,* 76 DPR 38, 92 (1954). Nosotros los Jueces, incluso, debemos evitar la mala práctica de acudir a preceptos constitucionales como fundamento para enmendar las leyes. En el ejercicio de nuestra función, debemos mantenernos "siempre dentro del ámbito judicial, sin incursiones indebidas en la esfera legislativa". *Caguas Bus Line, Inc. v. Sierra, Comisionado,* 73 DPR 743, 750 (1952); R.E. Bernier y J.A. Cuevas Segarra, *op. cit.*, pág. 299.

En este caso, el lenguaje claro e inequívoco del estatuto postula un solo significado y, consiguientemente, "un sentido cabal de humildad y autodisciplina requiere la aplicación de la voluntad legislativa" según establecida en el propio precepto legal. *Alejandro Rivera v. ELA, supra,* pág. 545. Véanse, además, *Cotto v. Depto. de Educación*, 138 DPR 658, 662 (1995); *Atlantic Pipe Corp. v. FSE*, supra. Veamos.

B.

El Artículo XIII de la Ley para la Descolonización, *supra*, dispone que

[l]as prohibiciones y delitos relacionados con la celebración de esta consulta, se regirán por las disposiciones establecidas en la Ley 78-2011, según enmendada, conocida como 'Ley Electoral de Puerto Rico' y por la Ley 222-2011, conocida como 'Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico', **excepto cuando sean improcedentes o incompatibles con las disposiciones de esta Ley o cuando esta Ley dispone delito o penalidad específica.** (Énfasis suplido).

Aunque la disposición que establece la veda electoral está contenida entre las prohibiciones y delitos que dispone la Ley Electoral de 2011, *supra*, ello no la hace aplicable automáticamente al proceso plebiscitario o al referéndum que autoriza la Ley para la Descolonización, *supra*. Según parece ignorar la opinión disidente del Juez Asociado señor Colón Pérez, **nótese que la aplicación del precepto estatutario que impone la veda electoral está sujeta a que eso no sea incompatible o improcedente ante la celebración del plebiscito o, de ser necesario, el referéndum.**[6] Por tanto, procede que analicemos dicho precepto.

---

[6] No se trata meramente de que la aplicación de la veda electoral sea necesaria o pertinente como expresa la opinión disidente del Juez Asociado señor Colón Pérez al referirse al Artículo 11.001 de la Ley Electoral de 2011, 16 LPRA sec. 4211. El referido Art. 11.001 establece subsidiariamente que: "Todo referéndum, consulta o plebiscito que se celebre en Puerto Rico se regirá por la ley especial que a tal fin se apruebe y por las disposiciones de este subtítulo en todo aquello necesario o pertinente para lo cual dicha ley especial **no disponga**". *Íd*. (Énfasis suplido).

No obstante, conforme **dispuso** la Asamblea Legislativa en la Ley para la Descolonización, *supra*, la condición para que proceda la aplicación del Art. 12.001 de la Ley Electoral de 2011, *supra*, es que éste sea **compatible y procedente** ante la celebración del plebiscito y, en su caso, el referéndum. Las disposiciones de una ley no se pueden leer a medias. Incluso, aun cuando la Ley para la Descolonización, *supra*, no hubiera dispuesto nada, el Art. 12.001 de la Ley Electoral de 2011, *supra*, no debe extenderse al proceso plebiscitario por no tratarse de una elección general. Como explicaremos, el legislador

El Artículo 12.001 de la Ley Electoral de 2011, *supra*, mediante el cual la Asamblea Legislativa incorporó en nuestro ordenamiento jurídico la llamada veda electoral, dispone de la manera siguiente:

> **Durante el año en que se celebre una elección general y hasta el día siguiente a la fecha de la celebración de la misma,** se prohíbe a las agencias del Gobierno, a la Asamblea Legislativa y a la Rama Judicial de Puerto Rico incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación, así como para la compra y distribución de materiales propagandísticos o promocionales **con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes.** Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley; las campañas de la Compañía de Turismo para promoción del turismo interno, campañas de promoción fuera de Puerto Rico por parte de la Compañía de Turismo de Puerto Rico o la Autoridad de Distrito del Centro de Convenciones de Puerto Rico promocionando a la isla de Puerto Rico como destino turístico, o la Compañía de Fomento Industrial promocionando la inversión del extranjero en Puerto Rico, **siempre que no incluyan relaciones de logros de la administración o la corporación ni se destaque la figura de ningún funcionario.** Además, se excluyen las notificaciones o convocatorias para procesos de vistas públicas legislativas o administrativas que se publique y circule sin usar los medios de difusión masiva pagados.
>
> **Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión.**
>
> […]
>
> La violación de este Artículo conllevará a la agencia o dependencia gubernamental una multa administrativa de hasta diez mil (10,000) dólares por la primera infracción y hasta veinticinco mil

---

estableció este proceso en la CEE únicamente para las elecciones generales.

(25,000) dólares por infracciones subsiguientes. Los fondos que se obtengan bajo este concepto, pasarán a formar parte del Fondo especial para el financiamiento de los gastos de automatización de los procesos electorales, según se dispone en el Artículo 3.001 de esta Ley. 16 LPRA sec. 4231. (Énfasis suplido).

Particularmente, la primera parte del Artículo 12.001, *supra*, fue objeto de alteración en el trámite legislativo.[7] Luego de ser aprobado por la Cámara de Representantes, en el Senado se agregó a su texto la expresión siguiente: "Durante el año en que se celebre una elección general y hasta el día siguiente a la fecha de la celebración de la misma".[8] Véase *Informe Comisión Especial sobre Reforma Gubernamental del Senado: Entrillado del Informe* emitido el 10 de noviembre de 2010. Con esa adición fue aprobada finalmente la Ley Electoral de 2011, *supra*.

De una lectura del precitado artículo, podemos notar que en este se hace alusión expresa al "año en que se celebre una elección general". Así pues, nuestra función principal en este caso es determinar si la Asamblea

---

[7] El texto original del proyecto de ley, según aprobado por la Cámara de Representantes y enviado al Senado, disponía en su primera oración lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico a la Asamblea Legislativa de Puerto Rico y a la Rama Judicial incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación y así como para compra y distribución de materiales propagandísticos o promocionales con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Sustituto de la Cámara al P. de la C. 1863 de 8 de marzo de 2011, 3ra Sesión Ordinaria, 16ta Asamblea Legislativa, pág. 188.

[8] *Íd.*

Legislativa incluyó dentro del concepto de "elecciones generales" la celebración de un plebiscito o un referéndum como el que instituye la Ley para la Descolonización, *supra*, para que, de este modo, sea procedente la aplicación del Artículo 12.001 de la Ley Electoral de 2011, *supra*, a dicha consulta de estatus.

Al hacer una interpretación de qué constituye una "elección general", no podemos presumir que los legisladores incluyeron disposiciones o palabras inútiles en la ley. R.E. Bernier y J.A. Cuevas Segarra, *op. cit.*, pág. 333. Es decir, no podemos partir de la premisa que la Asamblea Legislativa hizo expresiones o aclaraciones que no tienen ningún sentido o función en el estatuto que promulgaron.

En el ejercicio de nuestra función y en el cumplimiento de nuestro deber, no podemos ignorar que la propia Ley Electoral de 2011, *supra*, contiene una disposición en la que se definen varios conceptos que los legisladores consideraron importantes delimitar. Particularmente, la Asamblea Legislativa tomó de su tiempo para establecer el significado del término "elecciones generales". Al así hacerlo, aclaró que cuando se refirieran a ellas en la Ley Electoral de 2011, *supra*, debía entenderse que se trataba del "[p]roceso mediante el cual **cada cuatro años los electores seleccionan a los funcionarios que ocuparán cargos públicos electivos** en el

Gobierno de Puerto Rico incluyendo gobernador, comisionado residente, legisladores estatales, alcaldes y legisladores municipales". Artículo 2.003 de la Ley Electoral de 2011, *supra*. (Énfasis suplido).[9] De este modo, la Asamblea Legislativa evitó que utilizáramos nuestro propio criterio o tuviéramos que acudir a fuentes alternas o exteriores para encontrar el significado de lo que quiso decir. Por su pertinencia, estamos impedidos de hacer caso omiso a este articulado. Véase *ACAA v. Yantín*, 103 DPR 59, 62 (1974).

Debemos notar que expresamente la Ley Electoral de 2011, *supra*, establece que en las elecciones generales "los electores seleccionan a los funcionarios que ocuparán cargos públicos electivos en el Gobierno de Puerto Rico". *Íd.* Asimismo, hay que resaltar, inclusive, que la ley limita expresamente las elecciones generales al proceso electoral que se celebra **"cada cuatro años"**, a diferencia de su antecesora la Ley Electoral de Puerto Rico de 1977. A esta definición y a la aclaración realizada por la legislatura debe dársele su correspondiente significado y efecto al interpretar la ley.

---

[9] Véase, además, la *Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico*, Ley Núm. 222-2011, según enmendada, 16 LPRA sec. 621(28). Esta disposición define "elecciones generales" como

> aquel proceso mediante el cual el primer martes, después del primer lunes del mes de noviembre, cada cuatro años, los electores seleccionan a los funcionarios que han de ocupar los cargos públicos electivos en el Estado Libre Asociado de Puerto Rico, incluyendo gobernador, comisionado residente, legisladores estatales, alcaldes y legisladores municipales. *Íd.*

Como indicamos anteriormente, no podemos presumir que la Asamblea Legislativa incluyó en las leyes expresiones y aclaraciones inútiles. De hecho, si sustituimos la expresión "elección general" por la definición provista por el propio legislador, la primera oración del Artículo 12.001 de la Ley Electoral de 2011, *supra*, leería como sigue:

> Durante el año en que se celebre un [**proceso mediante el cual cada cuatro años los electores seleccionan a los funcionarios que ocuparán cargos públicos electivos en el Gobierno de Puerto Rico incluyendo gobernador, comisionado residente, legisladores estatales, alcaldes y legisladores municipales**] y hasta el día siguiente a la fecha de la celebración de[l] mism[o], se prohíbe a las agencias del Gobierno, a la Asamblea Legislativa y a la Rama Judicial de Puerto Rico incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación, así como para la compra y distribución de materiales propagandísticos o promocionales con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes.

Por otro lado, la Asamblea Legislativa dispuso de un concepto que utilizaría a través de la Ley Electoral de 2011, *supra*, para aquellas ocasiones en que estuviera refiriéndose tanto a elecciones generales, como a plebiscitos, a referéndums, a consultas al electorado, a elecciones especiales y a primarias. Véase Artículo 2.003(29) de la Ley Electoral de 2011, *supra*, 16 LPRA sec. 4003(29). En ese supuesto, dispuso que se referiría a ellas solamente como "elección" o "elecciones". *Íd.* Además, incluyó una definición distinta y separada de "plebiscito"

y de "referéndum". Estableció que un plebiscito es aquel "[m]étodo mediante el cual se somete al electorado de Puerto Rico para consulta electoral, la alternativa de escoger su preferencia entre varias opciones sobre un mismo asunto de ordenamiento político incluyendo, pero sin limitarse a, la relación política entre Puerto Rico y Estados Unidos de América". *Íd.*, inciso (82). Por su parte, estatuyó que el referéndum era el proceso "mediante el cual se somete al electorado de Puerto Rico para consulta electoral directa la aprobación o rechazo de una o varias propuestas específicas sobre políticas públicas a adoptarse o legislación a ponerse en vigencia sobre asuntos de interés general". *Íd.*, inciso (86).

Si la intención de la Asamblea Legislativa hubiese sido incluir los plebiscitos dentro de la prohibición contenida en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, hubiera bastado con referirse a la "elección" o las "elecciones". Esto, ya que, conforme se definió en la ley, ese solo concepto incluye, entre otras cosas, los referéndums y los plebiscitos. Como puede notarse, tanta fue la distinción que realizó la Asamblea Legislativa que, al establecer el significado de cada concepto, la sola adición de una palabra alteraría su significado.

No se trata de un escenario en que se pueda señalar que la Asamblea Legislativa no pudo prever la utilización de cierta palabra e inadvertidamente omitió su inclusión en

la disposición de ley. En la Ley Electoral de 2011, *supra*, el legislador incluyó referencia expresa a los plebiscitos y a los referéndums en varias de sus disposiciones.[10] No obstante, en el Artículo 12.001 de la Ley Electoral de 2011, *supra,* no se hace mención de estos. Evidentemente, la Asamblea Legislativa únicamente se refirió a la "elección general". La referencia específica a este evento electoral excluye otros eventos no incluidos en el referido concepto por la propia Asamblea Legislativa.

Además, una lectura minuciosa del propio Artículo 12.001 de la Ley Electoral de 2011, *supra*, demuestra que la intención de la Asamblea Legislativa fue evitar que el Gobierno en el poder pudiera tomar ventaja en el año en que se celebrara una elección general para promocionar sus **logros**, **proyectos**, **programas**, **realizaciones**, **proyecciones o planes** para obtener la victoria de sus funcionarios. A esta conclusión abunda, incluso, la excepción contenida en el Artículo 12.001 de la ley; específicamente al disponer que las agencias mencionadas en el Artículo están exceptuadas "siempre que no incluyan relaciones de logros de la administración o la corporación ni se destaque la figura de ningún funcionario". Véase 16 LPRA sec. 4231.

---

[10] Para conocer varias disposiciones sobre este particular, véanse: Arts. 3.003 (16 LPRA sec. 4013) (distingue periodos de reuniones de la Comisión conforme el evento electoral), Art. 3.015 (16 LPRA sec. 4025); Art. 9.003 (16 LPRA sec. 4143) (establece los días feriados para una elección general y distingue lo que sucede en el caso de un referéndum, plebiscito, consulta o elección especial); Art. 9.013 (16 LPRA sec. 4153); Art. 10.019 (16 LPRA sec. 4209); Arts. 11.001-11.010 (16 LPRA secs. 4211-4220).

Asimismo, concluir que la expresión "elección general" incluye la celebración de un plebiscito sería quitarles efecto a varias de las disposiciones de la propia Ley Electoral de 2011, *supra*. Particularmente, el Artículo 9.004 dispone que "[e]l propósito de las Elecciones Generales es la elección de todos los funcionarios en el Gobierno de Puerto Rico que conforme la Constitución de Puerto Rico y otras leyes especiales". 16 LPRA sec. 4144. De igual manera, el Artículo 9.001 establece que la elección general es la que se celebra cada cuatro años. *Íd.*, sec. 4141. Por ello, hacer extensible el plebiscito o -de ser necesario- el referéndum dentro de la referencia a la "elección general" resultaría en un contrasentido.[11]

Lo más lógico y razonable, conforme surge claramente de la Ley para la Descolonización, *supra*, y la Ley Electoral de 2011, *supra*, -interpretadas íntegra, armoniosamente y sin dejar sin efecto ninguna de sus disposiciones- es que las prohibiciones y delitos que aplican a la consulta de estatus son aquellas que resultan compatibles y procedentes porque no se establecieron para

---

[11] Para otras disposiciones que no tendrían sentido si el concepto de elecciones generales incluyera un plebiscito o un referéndum, véanse, además: Arts. 5.008, 6.012, 6.013, 6.016, 7.001, 7.014, 8.001, 8.004, 8.005, 8.007, 8.009, 8.012, 8.023, 9.001, 9.010, 9.011, 9.044, 10.013, 10.015 y 10.019 de la Ley Electoral de 2011, *supra*, 16 LPRA secs. 4048, 4072, 4073, 4076, 4091, 4104, 4111, 4114, 4115, 4117, 4119, 4122, 4133, 4141, 4150, 4151, 4184, 4203, 4205 y 4209, respectivamente.

una elección general u otro evento electoral distinto a un plebiscito o un referéndum.[12]

Como mencionamos, en nuestra función interpretativa no podemos ignorar el lenguaje claro y expreso de la ley. Tampoco podemos ignorar el significado que la Asamblea Legislativa le otorgó a cada término que debemos interpretar. La Ley Electoral de 2011, *supra*, claramente dispone que la veda electoral **únicamente** es aplicable en el año en que se celebra una elección general y, por ende, según definida, al evento electoral celebrado cada cuatro años en que los electores eligen a los funcionarios que ocuparán los cargos públicos electivos del Gobierno de Puerto Rico.

**VI**

Con relación a la opinión disidente del Juez Asociado señor Colón Pérez, es necesario hacer los planteamientos siguientes.

Lamentablemente, la opinión disidente del Juez Asociado señor Colón Pérez intenta repetir el error que cometimos hace más de dos décadas. En vez de llevar a cabo un análisis correcto de la disposición que estaba llamada a interpretar, se ampara en la Constitución -y en el erróneo

---

[12] Por ejemplo, serían aplicables los Arts. 12.003, 12.005, 12.006, 12.009, 12.024 de la Ley Electoral de 2011, *supra*, 16 LPRA secs. 4233, 4235, 4236, 4239, 4253a, respectivamente, entre otros.

precedente que hizo lo mismo- para llegar al resultado que le parece conveniente.

A pesar de que el texto del Artículo 12.001 de la Ley Electoral, *supra*, es claro, la opinión disidente del Juez Asociado señor Colón Pérez decide ignorarlo. Específicamente, concluye que "la activación de la veda electoral para la difusión de anuncios gubernamentales contenida en el Artículo 12.001 de la Ley Núm. 78-2011, no solo se limita a la celebración de elecciones generales, **como pretende sugerir su texto**". De este modo, omite utilizar el principio básico de hermenéutica que establece que cuando la ley es clara, la letra de ella **no debe ser menospreciada** bajo el pretexto de cumplir con su espíritu. Artículo 14 del Código Civil de Puerto Rico, *supra*.

No tan solo hace a un lado el texto del Artículo 12.001 de la Ley Electoral de 2011, *supra*, sino que lo descarta al amparo del mal llamado axioma constitucional de igualdad económica entre los partidos. Según discutimos, dicho axioma no es de linaje constitucional y no podemos seguir perpetuándolo como tal. Ciertamente reconocemos que después de "haber estado en vigor durante muchos años las constituciones y los estatutos y de haber sido interpretados por las cortes en varios casos, inevitablemente la tendencia es a leer los casos y no la constitución o el estatuto en sí cuando surge una cuestión sobre su alcance". *Pérez v. Tribunal de Distrito y Puig,*

*Interventores*, 69 DPR 4, 12 (1948). No obstante, ello no puede ser razón para que inmortalicemos errores.

Definitivamente, estamos impedidos de utilizar la Constitución para reconocer derechos inexistentes. R. Martínez Torres, *op. cit.*, pág. 249. Sin embargo, en la opinión disidente del Juez Asociado señor Colón Pérez, cometiendo el mismo desacierto que en *P.P.D. v. Gobernador II*, supra, no únicamente se constitucionaliza el principio de igualdad electoral económica, sino que como resultado se constitucionaliza la JEA, la cual, como discutimos, es de creación estatutaria. Además, se va más allá y se le intenta atribuir facultades a la JEA que no tiene. Específicamente, la opinión disidente del Juez Asociado señor Colón Pérez expresa lo siguiente: "se debe activar la J.E.A. como filtro para determinar si las agencias adscritas al Poder Ejecutivo pueden o no incurrir en gastos de fondos públicos en la publicación de anuncios; además de cerciorarse de que los referidos anuncios no estén matizados por posturas político-partidistas". En ese sentido, procura incorporar, mediante jurisprudencia, **una Junta para controlar el gasto fiscal en la publicación de anuncios,** en vista de la situación económica de Puerto Rico. Ello es improcedente. La JEA solo está facultada para evaluar los anuncios y no los gastos en los que incurra el Gobierno de Puerto Rico.

Ciertamente, la situación económica de Puerto Rico es preocupante. Empero, le corresponde al Gobierno de Puerto Rico y a la Asamblea Legislativa atender dicha situación. A nosotros solo nos corresponde aplicar el derecho. Si la Asamblea Legislativa entiende que la veda electoral debe aplicar al proceso plebiscitario que se avecina, le corresponde a esta enmendar el Artículo 12.001 de la Ley Electoral de 2011, *supra.* Este Tribunal no puede, por *fiat judicial*, extender dicha aplicación porque parece justo. La doctrina de separación de poderes nos lo impide.

## VII

Por los fundamentos antes expuestos, resolvemos que es improcedente activar la veda electoral contenida en el Artículo 12.001 de la Ley Electoral de 2011, *supra*, ante la consulta de estatus que autoriza la Ley para la Descolonización, *supra*. En consecuencia, revocamos la Resolución Núm. CEE-RS-17-07 emitida por la CEE.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista | | *Certificación Intrajurisdiccional* |
| Recurrida | | |
| v. | | |
| Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago | CT-2017-002 | |
| Recurridos | | |
| Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced | | |
| Recurridos | | |
| Senado de Puerto Rico, por conducto de su Presidente Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves; | | |
| Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Nuñez y su Secretaria Ayleen Figueroa Vázquez | | |
| Peticionarios | | |

SENTENCIA

En San Juan, Puerto Rico, a 19 de abril de 2017.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, resolvemos que es improcedente activar la veda electoral contenida en el Artículo 12.001 de la Ley Electoral de Puerto Rico, Ley Núm. 78-2011, ante la consulta de estatus que autoriza la *Ley para la Descolonización Inmediata de Puerto Rico*, Ley Núm. 7-2017. En consecuencia, revocamos la Resolución Núm. CEE-RS-17-07 emitida por la CEE.

Notifíquese inmediatamente mediante correo electrónico y por la vía ordinaria.

Así lo pronunció y manda el Tribunal y certifica el Secretario del Tribunal Supremo.

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez emitió una Opinión disidente. El Juez Asociado señor Colón Pérez emitió una Opinión disidente.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>Recurridos<br><br>v.<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y otros<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico por conducto de la Secretaria de Justicia, Wanda Vázquez Garced<br><br>Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente, Hon. Thomas Rivera Schatz y otros<br><br>Peticionarios | CT-2017-0002 | Certificación Intrajurisdiccional |

Opinión di
RODRÍGUEZ

En San Juan, Puerto Rico, a 19 de abril de 2017.

> *"Una Constitución no establece, ni debe establecer, normas para la hora que pasa, sino principios para un futuro que se expande".*[13]

Una doctrina resuelta por este Tribunal "no debe ser variada a menos que sea tan manifiestamente errónea que no pueda sostenerse sin violentar la razón y la justicia".

---

[13] PIP v. CEE, 120 DPR 580, 613 (1988)(citando a B.M. Cardozo, La naturaleza de la función judicial, Buenos Aires, Eds. Arayú, 1955, pág. 64).

<u>Capestany v. Capestany</u>, 66 DPR 764, 767 (1946). Al parecer, una mayoría de este Tribunal considera que el axioma constitucional de igualdad electoral consagrado en nuestra jurisprudencia violenta sus nociones ofuscas de razón y de justicia. Bajo esa impresión maltrecha de lo que significa una sociedad verdaderamente democrática e igualitaria, revocan una normativa de veda publicitaria que aplicaba al caso ante nosotros y merecía el más vigoroso amparo de este foro. No puedo estar en mayor desacuerdo y, por lo tanto, disiento.

I

*A. El axioma constitucional de igualdad electoral*

La Constitución de Puerto Rico establece un ordenamiento democrático según el cual el poder político emana de la participación del pueblo en las decisiones colectivas. Pmbl., Const. PR, LPRA, Tomo 1. A esos efectos, el derecho al voto constituye una de las garantías más básicas y paradigmáticas de nuestra sociedad. De ahí que nuestra Carta de Derechos disponga que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, sec. 2, Const. PR, LPRA, Tomo 1.

La disposición citada le impone al Estado una responsabilidad dual. <u>PPD v. Gobernador I</u>, 139 DPR 643, 670 (1995). En primer lugar, el Estado debe *abstenerse* de

interferir con el ejercicio libre del voto por parte de sus ciudadanos y, en segundo lugar, tiene un *deber afirmativo* de proteger al ciudadano contra cualquier coacción que pretenda interferir con el ejercicio de su prerrogativa electoral. Íd.

A tenor con un ordenamiento democrático en el que se garantiza el derecho igual al voto y se exige su protección mediante deberes concomitantes y afirmativos por parte del Estado, una serie de casos consignaban hasta hoy lo que se denominaba el *axioma constitucional de igualdad electoral*. Véanse PPD v. Gobernador I, supra; Marrero v. Mun. de Morovis, 115 DPR 643 (1984); PRP v. ELA, 115 DPR 631 (1984); PNP v. Tribunal Electoral, 104 DPR 741 (1976). En el espectro de ese axioma loable, este Tribunal interpretó que nuestra Constitución exige ciertos derechos y garantías adicionales al acto formal del voto. Es decir, que con el pasar del tiempo entendimos que el ejercicio cabal del derecho igualitario al voto precisa de circunstancias e, incluso, prohibiciones específicas.

En particular, este Tribunal resolvió que el axioma de igualdad electoral exige, entre otras condiciones, igual acceso de los partidos políticos a fondos electorales gubernamentales, PSP v. Srio. de Hacienda, 110 DPR 313 (1980)(Sentencia), e igual participación de los partidos políticos en los asuntos de la Comisión Estatal de Elecciones y la Junta de Inscripción Permanente, PRP v. ELA, 115 DPR 631 (1984); PSP v. Com. Estatal de

Elecciones, 110 DPR 400 (1980).[14] Así también, este Tribunal interpretó que el axioma de igualdad electoral prohíbe, entre otras prácticas, el uso de recursos públicos a beneficio de campañas políticas. Véase Miranda v. CEE, 141 DPR 775 (1996) y PPD v. Gobernador I, supra, (prohibiendo publicidad gubernamental con connotaciones político-partidistas); véase también Marrero v. Mun. de Morovis, 115 DPR 643 (1984)(prohibiendo el uso de vehículos públicos en campañas políticas).[15]

*B. Restricciones a la facultad de informar del gobierno*

Una de las prohibiciones o limitaciones que exige el axioma de igualdad electoral tiene que ver con la facultad del gobierno de comunicar determinada información a la ciudadanía. PPD v. Gobernador I, supra, págs. 681-82. A esos efectos, la jurisprudencia de este Tribunal reconoció al menos dos tipos de limitaciones en cuanto a la información o publicidad gubernamental se refiere.

Por un lado, está la prohibición de publicidad gubernamental de contenido político-partidista, la cual surge tanto del mencionado axioma de igualdad electoral

---

[14] Originalmente, este Tribunal había expresado que el axioma de igualdad electoral surgía del Artículo IX, sección 6, de nuestra Constitución, disposición transitoria que reconocía el disfrute de los derechos reconocidos en la Ley Electoral a aquellos partidos que cumplieran con los requisitos mínimos para quedar inscritos. Sin embargo, así también reconocimos que ese principio de igualdad constitucional no solo estaba contenido en la referida disposición transitoria, sino que además surgía de nuestra Carta de Derechos. PRP v. ELA, supra, pág. 637. Esta última base constitucional, en particular el Artículo II, sección 2, de nuestra Constitución, ha prevalecido desde entonces como la principal fuente jurídica del axioma de igualdad electoral.

[15] Véase J.J. Álvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, págs.965-67 (discutiendo el historial jurisprudencial del axioma de igualdad electoral).

como del Artículo IV, sección 9, de nuestra Constitución. Íd., pág. 701 (determinando que la utilización de ciertos "símbolos e insignias de naturaleza político-partidista ... [era] contraria al fin público que exige nuestro ordenamiento constitucional en la administración del erario y al axioma de paridad económica entre las fuerzas electorales que le sirve de norte").[16] Esta prohibición de publicidad con contenido político-partidista aplica en cualquier momento, incluso fuera de los ciclos electorales. Íd., pág. 692.

Por otro lado, reconocimos una limitación adicional a la publicidad gubernamental, aun cuando su contenido no fuera de índole político-partidista, comúnmente conocida como *veda electoral*. Esta existía hasta hoy para evitar la influencia que en términos generales puede tener la publicidad gubernamental promovida por el partido en el gobierno ante un evento electoral de fecha cercana. PPD v. Gobernador II, supra, págs. 926-27 (explicando que la veda electoral en esa ocasión buscaba "evitar que el Estado, mediante anuncios gubernamentales, pueda tener una influencia en la libre expresión de los ciudadanos en la votación").

---

[16] Este Tribunal ha utilizado el Artículo VI, sección 9, de nuestra Constitución como fundamento constitucional para la prohibición de publicidad con contenido político-partidista. Éste dispone lo siguiente: "Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Artículo VI, sec. 9, Const. PR, LPRA, Tomo 1. Véase PPD v. Gobernador I, supra, pág.688.

Este último caso, PPD v. Gobernador II, supra, era el precedente aplicable a la controversia ante nuestra consideración, el cual una mayoría de este Tribunal se negó a aplicar y, por lo tanto, revocó. En esa ocasión, este Tribunal se preguntó si el axioma de igualdad electoral exigía la aplicación de una veda electoral a un proceso de referéndum, incluso cuando la Ley Electoral en ese entonces solo aplicaba dicha veda electoral a las elecciones generales. Respondimos esa interrogante afirmativamente.

Según PPD v. Gobernador II, supra, la propaganda gubernamental por parte del partido en el gobierno representa una ventaja indebida que le permite a ese partido promover sus gestas y posturas de cara a un proceso electoral. La veda electoral opera entonces como una medida preventiva para evitar que esa ventaja se produzca a costa de fondos públicos y mediante propaganda gubernamental de diverso tipo. Íd., págs. 926-27. En ausencia de una medida estatutaria a esos efectos en un proceso electoral de referéndum, ésta se impuso en PPD v. Gobernador II, supra, "como imperativo del axioma de igualdad inmerso en la Constitución". Íd., pág. 926.

Puesto que el entonces Artículo 8.001 de la Ley Electoral disponía que la veda electoral aplicaría solo a las elecciones generales, este Tribunal se basó en el referido imperativo constitucional para extender la aplicabilidad del Artículo 8.001 al referéndum de entonces. Íd. Al hacerlo, recurrió al Artículo 5 de la Ley

Habilitadora del Referéndum en cuestión, el cual disponía que los artículos de la Ley Electoral serían supletorios a la Ley Habilitadora del Referéndum en todo aquello que fuera necesario, pertinente y compatible. Íd., pág. 924. De esta manera, este Tribunal concluyó que la veda establecida en la Ley Electoral, por constituir un imperativo constitucional, era una disposición compatible y consecuente con la Ley Habilitadora del Referéndum. Íd., pág. 926.

II

En lo que constituye un verdadero *déjà vu* jurídico, el caso ante nosotros hoy planteaba la misma pregunta que atendimos en PPD v. Gobernador II, supra. Se le preguntaba a este Tribunal si procede una veda publicitaria a nivel gubernamental durante procedimientos electorales, en particular un Plebiscito y un Referéndum, para los cuales la ley no contempló tal prohibición expresamente. Aunque conforme a PPD v. Gobernador II, supra, procedía responder afirmativamente, la mayoría responde en la negativa.

A. *Disposiciones estatutarias en controversia*

Mediante la Ley Núm. 7-2017, la Asamblea Legislativa dispuso una serie de consultas electorales en torno al estatus político de Puerto Rico a llevarse a cabo en 2017. No estableció una veda electoral específicamente aplicable a estos eventos, aunque reconoció que las "prohibiciones y los delitos relacionados con la celebración de [la] consulta, se regirán por las disposiciones establecidas en la [Ley

Electoral y Ley para la Fiscalización del Financiamiento de Campañas Políticas]". Artículo XIII, sec. 1(a), Ley Núm. 7-2017. De esta manera, cabe interpretar que el Artículo XIII tuvo el efecto de incorporarle a la Ley Núm. 7-2017 la sección de *Prohibiciones y Delitos Electorales* de la Ley Electoral, 16 LPRA secs. 4231-4255, salvo en todo aquello que resultara incompatible o improcedente.

La sección de *Prohibiciones y Delitos Electorales* de la Ley Electoral establece lo siguiente en su Artículo 12.001:

> Durante el año en que se celebre una *elección general* y hasta el día siguiente a la fecha de la celebración de la misma, se prohíbe a las agencias del Gobierno, a la Asamblea Legislativa y a la Rama Judicial de Puerto Rico incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación, así como para la compra y distribución de materiales propagandísticos o promocionales con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes…
>
> […]
>
> [S]e exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión. 16 LPRA sec. 4231 (énfasis suplido).

Nuevamente, la controversia puntual traída a nuestra consideración es si esta prohibición le aplica también a los eventos electorales de Plebiscito y Referéndum establecidos en la Ley Núm. 7-2017.

B. *El repentino abandono de un imperativo constitucional*

Según discutido previamente, el axioma constitucional de igualdad electoral limita las facultades del gobierno de

divulgar información. En particular, este Tribunal estableció en PPD v. Gobernador II, supra, que la veda electoral constituía un imperativo constitucional en aras de evitar que la publicidad gubernamental influencie directa o indirectamente a la ciudadanía en el ejercicio libre de su derecho al voto. Evidentemente, ese precedente regía la controversia ante nuestra consideración.

Valga recordar que mientras este Tribunal no revoque o modifique un precedente, el mismo constituye la doctrina establecida que los foros inferiores deben seguir. Capestany v. Capestany, 66 DPR 764, 767 (1946). Así también, una norma jurisprudencial "no debe ser variada a menos que sea tan manifiestamente errónea que no pueda sostenerse sin violentar la razón y la justicia". Íd. En materia electoral, la aplicación consecuente de los precedentes de este Tribunal cobra mayor envergadura aún, dado que incide sobre la credibilidad de este Tribunal y del ordenamiento democrático mismo.

De ahí que, en referencia al tratamiento de este Tribunal al axioma constitucional de igualdad electoral, el reconocido constitucionalista José Julián Álvarez González sugiriera que los tribunales debían aplicar consecuentemente dicha normativa o, de lo contrario, "abandonar la empresa".[17] En una crasa tergiversación de la dicotomía sugerida por el distinguido profesor, una mayoría

---

[17] "Si nuestros tribunales no son capaces de mantener un derrotero consecuente y justificable sobre este tema, harían bien en abandonar la empresa. La credibilidad del proceso judicial es un valor mucho más importante". Álvarez González, op. cit., pág. 967.

de este Tribunal no pudo optar por la consistencia y, en vez, optó por abandonar la empresa. Lamentablemente, abandonar la empresa en este caso implica pervertir nuestro ordenamiento democrático y desechar lo que antes habíamos denominado un imperativo constitucional.

Según la mayoría, la normativa de PPD v. Gobernador II, supra, es errada puesto que tuvo el efecto de constitucionalizar el mecanismo de veda publicitaria más allá de los procesos electorales contemplados por el legislador en la Ley Electoral. Op. Mayoritaria, págs. 20-21. En ese sentido, la elevación a rango constitucional de la llamada veda electoral representa una invención de derechos inexistentes que extiende indebidamente el significado de la Constitución. Íd. Bajo esa lógica, ausente una expresión clara del legislador imponiéndole la veda electoral a procesos electorales como los dispuestos en la Ley Núm. 7-2017, la misma resulta improcedente.

Con el poco tiempo que la mayoría de este Tribunal nos concedió para expresarnos, delineamos al menos tres problemas sustanciales con la postura mayoritaria. Veamos.

i.  El consagrado axioma de igualdad electoral

En claro desdén de la jurisprudencia previa, una mayoría de este Tribunal derriba un componente del axioma de igualdad electoral, esto es, la veda electoral, sin advertir que con ello arriesga también el axioma en su totalidad. Como mencionáramos antes, la jurisprudencia de

este Tribunal no solo había resuelto que el axioma de igualdad impedía una desventaja electoral producto de la publicidad gubernamental, sino que además proscribía otras prácticas incompatibles con un sistema democrticoá. Como bien resume el profesor Álvarez González, este Tribunal descansó en el axioma de igualdad electoral para disponer lo siguiente:

> (1) igualdad de participación de los partidos en el Fondo Electoral, sin sujeción a su pujanza electoral previa; (2) igualdad en la participación de los partidos por petición junto con los principales en la administración de la Comisión Estatal de Elecciones; (3) prohibición del uso de vehículos en campañas políticas; (4) prohibición de uso de fondos públicos para campañas gubernamentales antes de un referéndum para enmendar la Constitución; (5) prohibición del uso de fondos públicos para campañas gubernamentales que benefician al partido en el poder; (6) inconstitucionalidad de una ley para votar por el Presidente de Estados Unidos. Álvarez González, op. cit., pág. 965 (citas omitidas).

A pesar del historial extenso de ese axioma constitucional, la mayoría nos informa hoy que el "mal llamado" axioma de igualdad electoral "no existe en la Constitución". Op. mayoritaria, págs. 16-17.

Nos informa entonces que son letra muerta las expresiones de este Tribunal a los efectos de que "[l]a **igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución** [y] [p]or su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones". PRP v. ELA, supra, pág. 633 (énfasis suplido). Además, son letra muerta aquellas expresiones en

las que este Tribunal consignó que, "[e]n la medida en que se subvencione una campaña político-partidista con fondos públicos, se le permite una ventaja a un partido (o candidato político) sobre otros, lo que atenta contra el **axioma de igualdad electoral** y socava los pilares del esquema electoral en nuestro País". PPD v. Gobernador I, supra, pág. 671 (énfasis suplido).

Resulta inaceptable asumir con tal liviandad el peso de esas palabras y de nuestros precedentes, más aún cuando esa actitud judicial reduce la protección de los derechos constitucionales, en vez de ampliarla. La doctrina del precedente, y sus respectivas excepciones, no pueden ni deben servir, como lo hacen hoy, de meras etiquetas legales para ocultar los caprichos de cada cual.[18] Tal uso desvirtúa el objetivo medular de esa doctrina de proveer estabilidad jurídica y estropea la ya lastimada credibilidad de este Tribunal.

ii. El rol de los tribunales en el constitucionalismo moderno

Es menester destacar también que la mayoría de este Tribunal parte de una noción minimalista de nuestra Constitución, según la cual este foro está impedido de extender el significado de nuestro ordenamiento

---

[18] "[H]emos identificado tres circunstancias que, como excepción, justifican dejar a un lado un precedente: "(1) si la decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". Pueblo v. Sánchez Valle, 192 DPR 594, 645-46 (2015)(citando a Pueblo v. Camacho Delgado, 175 DPR 1, 20 esc. 4 (2008)).

constitucional más allá del texto del documento magno. Op. mayoritaria, págs. 20-21 (citando a R. Martínez Torres, *El originalismo como método de interpretación constitucional y el principio de separación de poderes*, 49 Rev. Jur. UIPR 249, 249 (2015)). Ese entendido es insostenible cuando se toma en cuenta el rol extenso que este Tribunal ha asumido previamente en la protección de los derechos constitucionales de índole político, social, laboral y criminal.[19] Así también, resulta ajeno al desarrollo del constitucionalismo moderno del cual forma parte nuestro ordenamiento democrático.

En un estado de derecho democrático, el poder judicial funge, precisamente, como garante de los derechos constitucionales y de las condiciones necesarias para su disfrute. Véase E. Rivera Ramos, *Los derechos y la democracia: ¿conflicto o complementariedad?*, en Los derechos fundamentales, R. Saba ed., 2001. Ese rol no constituye una mera opción o preferencia teórica, sino una función deontológica insertada en el andamiaje constitucional que le asigna al poder judicial la interpretación de la propia Constitución. Íd. ("[E]sa

---

[19] Los ejemplos sobran en la jurisprudencia de este Tribunal donde se reconocen garantías y protecciones específicas dentro de derechos constitucionales más amplios, como el debido proceso ley, la intimidad, la dignidad humana, la igual protección de las leyes, la libertad de expresión, el derecho al voto, la libertad de prensa y la libertad de culto. Véanse e.g. Arroyo v. Rattan, 117 DPR 35 (1986)(la aplicación del derecho a la intimidad entre partes privadas); Soto v. Srio de Justicia, 112 DPR 477 (1982)(derecho de acceso a la información como parte de la libertad de expresión); Figueroa Ferrer v. ELA, 107 DPR 250 (1978)(derecho al divorcio como parte del derecho a la intimidad); Pueblo v. Dolce, 105 DPR 422 (1976)(reconociendo factura más ancha en la protección contra registros y allanamientos).

función de garante de las pre-condiciones de la democracia puede serle asignada al poder judicial en la propia Constitución, por voluntad mayoritaria, como ocurre en algunas constituciones modernas"); J.J. Álvarez González, *La protección de los derechos humanos en Puerto Rico*, 57 Rev. Jur. UPR 133, 174 (1988)("[L]a revisión judicial es la forma más conocida […] que en [los sistemas constitucionales de Estados Unidos y Puerto Rico] existe para hacer realidad las garantías que sus Constituciones prometen").

En ese sentido, ese deber le fue asignado a este Tribunal como último intérprete de la Constitución, con la facultad correlativa de declarar inconstitucional aquellas normas o prácticas en las que otras ramas de gobierno incurran. Artículo V, sec. 4, Const. PR, LPRA, Tomo 1; véase <u>Santa Aponte v. Srio. de Hacienda</u>, 105 DPR 750, 759 (1977)("La función de ser intérprete final de la Constitución le corresponde exclusivamente a un solo poder, al Poder Judicial. La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales").

La labor de revisión judicial incluye también la facultad de este Tribunal de subsanar una deficiencia constitucional allí donde el Estado malogra o incumple su respectivo deber de garantizar mediante legislación los

derechos constitucionales de la ciudadanía. Véase Artículo II, secs. 1-2, Const. PR, LPRA, Tomo 1 ("Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana"; "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral"); véase también García v. Aljoma, 162 DPR 572, 580-82 (2004).

Como mencionara antes, en materia de igualdad electoral, hay pues un deber afirmativo por parte del Estado de garantizar el ejercicio real de esos derechos mediante prohibiciones y limitaciones específicas. PPD v. Gobernador I, supra, pág. 670; véase E. Rivera Ramos, *El estado de derecho: Aproximación al concepto,* 81 Rev. Jur. UPR 1113, 1119-1120 (2012)(donde se menciona la importancia de garantías normativas e institucionales para la protección de los derechos fundamentales). Abdicar a la vigilia constante de esos derechos, así como de sus condiciones necesarias, es ignorar que "la mera igualdad ante la ley no le garantiza el disfrute real de los derechos a muchas personas". E. Rivera Ramos, *La igualdad una visión plural,* 69 Rev. Jur. UPR 1, 12-13 (2000). Es también reducir nuestra Constitución a una formalidad, en vez de otorgarle la fuerza vinculante y el valor social que amerita.

### iii. La importancia de la veda publicitaria en procesos electorales

La veda electoral, en tanto mecanismo necesario para el ejercicio igualitario del proceso electoral y del derecho al voto, procura legitimar el carácter plenamente democrático de nuestro sistema de gobierno. Para que nuestro gobierno se base en la voluntad del pueblo, esa voluntad ha de estar libre de coacciones y de influencias indebidas por parte del propio gobierno. De lo contrario, la esencia democrática del mandato electoral y, por lo tanto, la legitimidad del poder gubernamental queda en entredicho. Véase E. Ziegler, *Government Speech and the Constitution: The Limits of Official Partisanship,* 21 B.C.L. Rev. 578, 579-80 (1980)("It is a truism that, if a governing structure based upon widespread genuine citizen opinions is to survive as a viable democracy, it must place legal restraints on the government's ability to manipulate the formulation and expression of that opinion"); véase también PPD v. Gobernador I, supra, pág. 701 (citando a S. Shiffrin, *Government Speech*, 27 UCLA L. Rev. 565, 612 (1980))("[P]ermitirle al gobierno, armado con el mayor tesoro de campaña —el erario público— intentar dominar un proceso electoral, atenta contra la integridad básica del proceso democrático").

De ahí que la postura asumida por este Tribunal hace más de veinte años fuera la más sabia y cónsona con nuestra

Constitución. La propaganda ilimitada y excesiva por parte del gobierno durante cualquier proceso electoral "constituye una forma abierta y velada de coacción electoral con el propósito de beneficiar al partido que controle la Rama Ejecutiva", PPD v. Gobernador II, supra, pág. 929 (Op. de conformidad, J. Hernández Denton); véase Stern v. Kramarsky, 375 N.Y.S. 2d 235, 239 (1975)("It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United States of America"). Hoy más que nunca, en una época de comunicación masiva por los medios más diversos, inmediatos y efectivos, resultaba propicio limitar la influencia de la publicidad gubernamental en la voluntad ciudadana.

La mayoría del Tribunal descarta nuestros pronunciamientos anteriores como un invento; como una constitucionalización ilegítima. Sorprendentemente, no expresa justificación alguna para abandonar el mentado axioma de igualdad electoral, sino que reduce su análisis a la ausencia de bases constitucionales al respecto. Ignora así fundamentos potenciales a nivel federal, como los señalados por el profesor Nelson Tebbe, quien sostiene que la propaganda gubernamental irrestricta también contraviene

principios de debido proceso ley, igual protección de las leyes y libertad de expresión. N. Tebbe, *Government nonendorsement*, 98 Minn. L. Rev. 648, 668-76, 712 (2013)("[O]fficial speech is limited by a principle of government nonendorsement that cuts across various constitutional provisions and that brings them together to protect full and equal citizenship in a free society"); véase S. Shiffrin *Government Speech*, 27 U.C.L.A. L.R. 565, 617-22, 655 (1980)("Government speech relating to ballot questions raises serious first amendment problems, and general rules need to be formulated that limit government departures from electoral neutrality").[20]

En fin, erra la mayoría al enajenarse de todas estas consideraciones y reducir así la veda publicitaria de cara a un proceso electoral a una mera preferencia a merced de las prerrogativas del ente legislativo en el poder. Los precedentes de este Tribunal y la conciencia de la realidad social en la que opera nuestro ordenamiento constitucional dictaminaban lo contrario.

III

Al igual que en PDD v. Gobernador II, supra, el artículo que actualmente establece la veda electoral en la Ley Electoral solo se refiere a una "elección general".

---

[20] Véase también Int'l Ass'n. of Machinists v. Street, 367 U.S. 740, 788 (1961)(Op. disidente, J. Black)("Probably no one would suggest that Congress could, without violating [the First] Amendment ... create a fund to be used in helping certain political parties or groups favored by the Government to elect their candidates or promote their controversial causes"); Lathrop v. Donohue, 367 U.S. 820, 853 (1961) (Op. concurrente, J. Harlan) ("[A] State could not 'create a fund to be used in helping certain political parties or groups favored' by it 'to elect their candidates or promote their controversial causes'").

16 LPRA sec. 4241. De ahí que la Opinión mayoritaria destaque que su lenguaje es puntual al disponer que la veda electoral aplicará a las *elecciones generales*, término que la propia Ley Electoral define como "[p]roceso mediante el cual los electores seleccionan uno o más funcionarios dentro de una demarcación geográfica para cubrir una o más vacantes en un cargo público electivo en el Estado Libre Asociado de Puerto Rico". 16 LPRA sec. 4003(31). A su juicio, ya sea que acudamos al propio Artículo 12.001 de la Ley Electoral, o a la referencia hecha en la Ley Núm. 7-2017 a las prohibiciones y delitos de la misma Ley Electoral,[21] la terminología utilizada por el legislador está igualmente limitada a las *elecciones generales*.

Ahora bien, al detener nuestro análisis en el texto del Artículo 12.001 de la Ley Electoral, los eventos electorales contemplados en la Ley Núm. 7-2017 sufrían de una deficiencia constitucional significativa a la luz de lo dicho en PDD v. Gobernador II, supra. No obstante, en nuestro ordenamiento "las leyes se presumen constitucionales hasta tanto un tribunal competente declare lo contrario". Brau v. ELA, 190 DPR 315, 337 (2014). Desde esa perspectiva, "los tribunales deben esforzarse por lograr interpretaciones congruentes y compatibles que adelanten la

---

[21] "Las prohibiciones y los delitos relacionados con la celebración de [la] consulta, se regirán por las disposiciones establecidas en la Ley 78-2011, según enmendada, conocida como la 'Ley Electoral de Puerto Rico' y por la Ley 222-2011, conocida como 'Ley para la Fiscalización del Financiamiento de Campañas Políticas en Puerto Rico', excepto cuando sean improcedentes o incompatibles con las disposiciones de esta Ley o cuando esta Ley dispone delito o penalidad específica". Artículo XIII, sec. 1(a), Ley Núm. 7-2017.

constitucionalidad de las leyes". Íd. Así, "cuando se cuestiona la validez de una ley o se suscita alguna duda sobre su constitucionalidad, los tribunales deben asegurarse de que no existe otra posible interpretación razonable de la ley". Íd., pág. 338.

Es por eso que, aunque reconozco que una lectura aislada de las disposiciones antes citadas sugiere que la veda electoral no le aplica a los procesos electorales ante nuestra consideración, corresponde una lectura integral de la ley para auscultar su constitucionalidad conforme a PDD v. Gobernador II, supra. Considero que el Artículo 11.001 de la propia Ley Electoral adelantaba ese cometido. Dicho artículo establece que "[t]odo referéndum, consulta o plebiscito que se celebre en Puerto Rico se regirá por la ley especial que a tal fin se apruebe y *por las disposiciones de este subtítulo en todo aquello necesario o pertinente para lo cual dicha ley especial no disponga*". 16 LPRA sec. 4211 (énfasis suplido).

En el esfuerzo por interpretar la Ley Electoral y la Ley Núm. 7-2017 en sintonía con los preceptos constitucionales hasta hoy vigentes, opino que el Artículo 11.001 permitía la interpretación más razonable del marco jurídico de estas leyes, a la vez que respaldaba su constitucionalidad. Es decir, no bastaba la insistencia en que el Artículo 12.001 de la Ley Electoral solo se refiere a las *elecciones generales*, sino que resultaba necesario

advertir además el conocimiento que tiene y debe tener el legislador de la normativa constitucional aplicable, así como de la jurisprudencia de este Tribunal al respecto. Véase Exposición de Motivos, Ley Núm. 78 de 1 de junio de 2011(reconociendo que la Ley Electoral ha sido objeto de cuantiosas interpretaciones por parte de los tribunales). En ese sentido, y precisamente por tratarse de un imperativo constitucional, la veda electoral constituía un aspecto necesario y pertinente a los procesos de Plebiscito y Referéndum aquí en controversia, para el cual su ley especial no dispuso.[22]

En conclusión, una interpretación razonable de la disyuntiva ante este Tribunal hubiese sido que, a través del Artículo 11.001 de la Ley Electoral, el legislador le aplicó a los eventos electores contemplados en la Ley Núm. 7-2017 aquellas disposiciones de la Ley Electoral que le resultaran necesarias y pertinentes. Así, procedía aplicarle la veda publicitaria de la Ley Electoral al Plebiscito y Referéndum establecidos mediante la Ley Núm. 7-2017 como una disposición necesaria y pertinente de acuerdo al hoy deshecho imperativo constitucional de PDD v. Gobernador II, supra.

---

[22] Como mencionara antes, similar interpretación hizo este Tribunal en PDD v. Gobernador II, supra. La ley especial que establecía el referéndum de entonces contenía una disposición según la cual todo aquello necesario, pertinente y compatible en la Ley Electoral, y para lo cual la ley especial del referéndum no hubiese dispuesto, le aplicaría supletoriamente. Íd., pág. 924. Al resolver que la veda electoral constituía un imperativo constitucional, este Tribunal concluyó que el Artículo 8.001 (que regulaba la veda electoral en ese entonces) "resulta[ba] compatible y consecuentemente aplicable a la Ley Habilitadora de Referéndum". Íd., pág. 926.

IV

PDD v. Gobernador II, supra, representaba una norma constitucional de gran valor democrático que aplicaba perfectamente al caso ante nuestra consideración. Nuestro ordenamiento constitucional debería repudiar cualquier tipo de ventaja electoral sufragada con fondos públicos en aras de asegurar que todas las preferencias ideológicas se presentan ante el electorado en la mayor igualdad de condiciones que el Estado sea capaz de garantizar. Considero que, por imperativo constitucional, la veda publicitaria que establece la Ley Electoral le aplica al Plebiscito y Referéndum dispuestos en la Ley Núm. 7-2017. Por esa razón, disiento enérgicamente de una mayoría de este Tribunal que hoy determina lo contrario, de forma tal que debilita la doctrina del precedente en nuestro estado de derecho y derrumba uno de los pilares de nuestro ordenamiento democrático.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>Recurridos<br><br>v.<br><br>Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced<br><br>Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente, Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves; Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Nuñez y su Secretaria Ayleen Figueroa Vázquez<br><br>Peticionarios | CT-2017-0002 | Certificación intrajurisdiccional |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 19 de abril de 2017

Continúa el "[m]al tiempo para votar". José Saramago, *Ensayo sobre la lucidez*

Este proceso plebiscitario que se avecina y los incidentes en este Tribunal muy bien podrían denominarse -con el perdón, claro está, de don Gabriel García Márquez- *Crónica de un plebiscito apañado.*[23] Todo comenzó en el año

---

[23] El trámite seguido para certificar esta opinión ha sido, por demás, atropellado a pesar de que nos encontramos ante una controversia de envergadura constitucional, donde la mayoría revoca jurisprudencia de avanzada de este Tribunal. Se ha certificado esta ponencia en apenas unas horas, sin la debida deliberación y en un proceso, francamente, imprudente. Me explico.

El pasado 11 de abril de 2017, se circuló un borrador de ponencia en este caso y se indicó que se interesaba certificar la Opinión el lunes, 17 de abril. En esa fecha, el Juez ponente en la opinión que hoy certificamos, circuló una opinión disidente la cual obtuvo el aval de una mayoría de los miembros del Tribunal. Esa misma tarde se le refirió el expediente, como es costumbre, para que reformulara su ponencia y circulara nuevamente.

A esos efectos, en la mañana de ayer, se circuló la ponencia reescrita y el Juez ponente indicó que se certificaría esa misma tarde a las 5:00 p.m. Cabe señalar que en la tarde del lunes 17 de abril, expresé por escrito que me proponía suscribir una opinión disidente. Por tanto, al recibir la comunicación indicando que la certificación era en horas de la tarde del día en que se había circulado la ponencia reformulada solicité, nuevamente por escrito, que se reconsiderara el calendario propuesto. Esta petición se hizo a las 11:12 a.m. El Juez ponente guardó silencio y a las 3:42 p.m., circuló un memorando reiterándose en que se proponía certificarla esa misma tarde. Este proceder refleja una lamentable carencia de los más elementales principios de urbanidad y civilidad y no está a la altura de lo que se esperaría de un miembro de esta Curia.

Afortunadamente, un miembro de esa mayoría consideró prudente y razonable posponer por 24 horas dicha certificación, como se había propuesto durante el día de ayer. De esta forma se obtuvieron los 5 votos necesarios para certificar la ponencia hoy.

2009, cuando las olas desatadas por la marea judicial provocaron que una mayoría de este Tribunal en *Suárez Cáceres v. CEE*, 176 DPR 31 (2009), un caso que versaba sobre cómo contar votos para efectos de la *Ley de Minorías*, decidiera sin explicación jurídica alguna, revocar un viejo precedente, a saber: *Sánchez y Colón v. ELA,* 134 DPR 445 (1993).

Como recordarán, en *Sánchez y Colón*, este Tribunal acató su deber de asegurar que la legislación promulgada para la celebración del plebiscito de *status* de 14 de noviembre de 1993 cumpliese con aquellas garantías constitucionales que aseguran la condición fundamental y preeminente del derecho al sufragio. A esos efectos, se validó la adjudicación de papeletas depositadas en blanco como un voto que no favorecía ninguna de las definiciones de estatus propuestas por los partidos políticos para ese plebiscito.

Conviene que refresquemos la memoria sobre lo que dijimos en *Suárez Cáceres, ante,* en nuestro voto disidente, porque nos ayuda a entender cómo se ha ido escribiendo esta *Crónica*. Allí dijimos, citamos extensamente:

---

Francamente no creo que la desmedida "prisa" en certificar se justifique. Ello es más patente aun cuando sabemos que la ley que evaluamos está siendo enmendada en estos precisos momentos por la legislatura. Es más, se le ha cambiado hasta el nombre y luego de aprobada, hay que enviarla al Departamento de Justicia de Estados Unidos para su revisión. ¿Cuál es la urgencia? Este curso de acción, muy bien pudiera dar pie a que alguien pueda pensar, que se interesa reaccionar al revés público que supuso la carta enviada por el Departamento de Justicia de Estados Unidos.

[L]a revocación de *Sánchez y Colón v. E.L.A. I*, ante, se revela como una determinación totalmente innecesaria por lo planteado en este caso y **cuya realidad enmascara otros designios.**

En rigurosa juridicidad, la controversia que tuvimos ante nuestra consideración en *Sánchez y Colón*, ante, es disímil a la planteada en este caso. En *Sánchez y Colón*, ante, se cuestionó la constitucionalidad de la Ley Núm. 22 de 4 de julio de 1993 (1993 Leyes de Puerto Rico 101), que autorizaba la celebración de un referéndum de *status* con las fórmulas siguientes: Estado Libre Asociado, Estadidad e Independencia. Los demandantes alegaron que eran electores debidamente inscritos; que no estaban afiliados a ninguno de los tres partidos políticos; que no estaban de acuerdo con las definiciones de las fórmulas de *status* que se recogían en la papeleta; que la ley no les concedía una oportunidad de votar por las alternativas de su preferencia, y que todo ello les violaba su derecho al voto, a la libre expresión y asociación, y a la igual protección de las leyes, tanto bajo la Constitución del Estado Libre Asociado de Puerto Rico como la de Estados Unidos de América.

Confrontados con esta controversia, reconocimos que en materia de hermenéutica constitucional, cuando nos enfrentamos a estatutos que adolecen de inconstitucionalidad por subinclusión, ostentamos la facultad de extender los beneficios estatutarios a aquellos grupos o clases excluidos. *Sánchez y Colón*, ante, pág. 450. De acuerdo con este principio y considerando los hechos particulares de ese caso, y como mecanismo para "superar las serias objeciones constitucionales planteadas por los demandantes", le ordenamos a la Comisión Estatal de Elecciones que adjudicase "las papeletas que se depositen en blanco como un voto que no favorece ninguna de las definiciones de *status* propuestas por los partidos". *Sánchez y Colón*, ante, págs. 450-451.

Así pues, las expresiones relacionadas con las papeletas en blanco se dan en el contexto de configurar un remedio que evitase declarar inconstitucional el evento electoral que se avecinaba. En otras palabras, ante los visos de inconstitucionalidad por subinclusión de que adolecía la Ley Núm. 22, teníamos que escoger

entre dos alternativas, a saber: anular el proceso electoral o configurar un remedio que subsanara el problema de subinclusión de la ley. Naturalmente, se escogió el segundo camino. […]

*Lo que sí resolvimos en Sánchez y Colón, ante, y sobre lo cual la mayoría nada dice, fue que en un referéndum de "status" hay que proveerle a aquellos grupos o clases que quedan excluidos de las definiciones de "status" sobre las que se vota, un lugar en la papeleta donde se recoja su expresión. […] Ese es el ratio de Sánchez, Colón, ante; esa es la importancia de ese caso que tanto incomoda a la mayoría. Evidentemente, Sánchez y Colón, ante, poco tiene que ver —por no decir que nada— con cómo se cuentan los votos para efectos de la "Ley de Minorías", que es la controversia en este caso a juicio de la mayoría.* Indudablemente, para llegar a la conclusión a que llega el Tribunal hoy, en correcta metodología adjudicativa, éste no tenía que revocar a *Sánchez y Colón*, ante.

Llama marcadamente la atención que en ningún lugar de las sesenta y cuatro páginas de la opinión, el Tribunal explica lo que verdaderamente resolvimos en *Sánchez y Colón*, ante, y por qué es necesario ahora revocarlo en el contexto de este caso. Un silencio que es resonante y ensordecedor. Sin mucho apuro, parece razonable concluir que la controversia entre Jorge Suárez Cáceres y Ángel Rodríguez Otero es secundaria; *es, meramente, el pretexto utilizado para desdibujar la norma constitucional que exige que en un proceso de referéndum, al igual que un plebiscito, haya que proveer un espacio en la papeleta para aquellos grupos o clases de ciudadanos que no favorezcan las definiciones propuestas sobre las que se votará. Sánchez y Colón, ante, pág. 451. Entendido así, el curso de acción de la mayoría constituye un flagrante asalto a la Democracia.*

*[…]*

Es decir, la razón de ser del dictamen de hoy no es lo que se nos dice en la opinión del Tribunal, a saber, cómo aplicar la "Ley de Minorías", sino, […], **allanar el camino para un futuro referéndum o plebiscito de *status*.** *Suárez Cáceres*, 178 DPR 112, págs. 115-117 (2009) (Rodríguez Rodríguez,

> J., Op. disidente). (Énfasis en original y nuestro.)

El transcurso del tiempo ha corroborado lo que propusimos como explicación a lo que en aquél entonces parecía inexplicable. *Suárez Cáceres*, es el primer capítulo de esta *Crónica* escrita por la marea judicial.

Hoy, la marea vuelve a azotar nuestras costas escribiendo lo que parece ser el último capítulo de la *Crónica de un plebiscito apañado*, al revocar el caso *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994). En esa ocasión hicimos extensiva la veda electoral para la difusión de anuncios gubernamentales de las elecciones generales contenidas en la *Ley electoral* de 1977, Ley Núm. 4 de 20 de diciembre de 1977, 16 LPRA sec. 3351, a la consulta electoral sobre ciertas enmiendas a la Constitución del Estado Libre Asociado de Puerto Rico mediante un referéndum. Esta determinación se fundamentó en el axioma de igualdad económica de nuestra Constitución y el derecho al sufragio como elemento compartido por las elecciones generales y los referéndum. Hoy, sin más, una mayoría destierra de nuestro país el principio de igualdad económica electoral sin considerar, ni importar, sus efectos sobre la legitimación de la democracia.

En esta ocasión, tras emplear un alegado "análisis textualista", lacónico por demás, la mayoría concluyó que es inexistente el axioma de igualdad económica electoral, puesto que la Constitución del Estado Libre Asociado de

Puerto Rico no dispone expresamente sobre ello. La opinión suscrita por una mayoría obvia por completo que el sufragio es un derecho intrínseco de la democracia, cuya piedra angular, a su vez, es la igualdad para la consecución de la justicia. Este derecho, como todo derecho, no es más que una conquista de libertad, que hoy lamentablemente se quebranta porque precisamente hoy, no conviene.

Históricamente, el ideal de la igualdad en el contexto eleccionario se ha erigido sobre esquemas para el financiamiento de los partidos políticos y de los procesos electorales. Uno de los mecanismos adoptados en Puerto Rico, y gran parte del mundo, es el financiamiento público de los procesos electorales y de los partidos políticos. Este esquema pretende, en primer lugar, combatir el "inversionismo" político y, en segundo lugar, garantizar una distribución igualitaria de bienes o subsidios directos e indirectos. En el presente caso, la veda electoral —al igual que otras prohibiciones contenidas en la *Ley electoral de Puerto Rico*, Ley Núm. 78-2011, 16 LPRA sec. 4231— crean medidas preventivas tendentes a evitar la malversación de fondos, la corrupción y el mencionado "inversionismo" político.

Además, hay que resaltar que la mayoría revoca *P.P.D. v. Gobernador II*, *motu proprio*, ¡nadie lo solicitó, nadie lo argumentó! Por el contrario, los peticionarios en varias ocasiones, tanto en su petición de certificación como en su

alegato, reconocen la validez del caso como jurisprudencia vigente, más lo distinguen para sostener que la norma que allí se sentó no aplica a la situación planteada en este caso, **pero en ningún momento plantean que hay que revocarla y por qué**. Con su proceder, la mayoría transgrede el derecho de los recurridos a rebatir este planteamiento con sus propios fundamentos. Es más, la mayoría adopta un curso de acción idéntico al que le critica al Tribunal que suscribió *P.P.D. v. Gobernador II, ante.*[24] Estamos, francamente, ante argumentos o fundamentos estólidos.

Pero hay más, se hace constar en la opinión mayoritaria que en *P.P.D. v. Gobernador II*, este Tribunal confirmó la determinación del foro primario sin que ninguno de los peticionarios impugnara la constitucionalidad de la

---

[24] Por otro lado, yo tenía entendido que el derecho es rogado y que planteamientos no argüidos por las partes, particularmente de índole constitucional, no serán atendidos por este Tribunal. Véase, por ejemplo, *ELA v. Northwestern Selecta*, 185 DPR 40 (2012); *Abengoa, S.A. v. American Intl. Ins.*, 176 DPR 512 (2009) (Es un principio de derecho arraigado en nuestro ordenamiento que, en apelación, nos abstendremos de adjudicar cuestiones no planteadas ante el Tribunal de Primera Instancia); *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008) (Es norma vigente en nuestra jurisdicción que en apelación nos abstendremos de adjudicar cuestiones no planteadas ante el tribunal de instancia); *Delgado, Ex Parte*, 165 DPR 170 (2005); *Dorante v. Wrangler of P.R.*, 145 DPR 408, 443 (1998); *Trabal Morales v. Ruiz Rodríguez*, 125 DPR 340 (1990) (Así nos adherimos a la norma vigente de que en apelación nos abstendremos de adjudicar cuestiones no planteadas en primera instancia); *Sánchez v. Eastern Air Lines, Inc.*, 114 DPR 691 (1983); *Santiago Cruz v. Hernández Andino*, 91 DPR 709, 712 (1965). Por lo menos esa era la norma hasta hoy. A no ser que en un futuro, el vaivén de la marea requiera otro resultado cuando se escriba un nuevo capítulo de esta *Crónica*.

*Ley habilitadora del referéndum sobre enmiendas a la Constitución de Puerto Rico de 1994*, Ley Núm. 49 de 2 de agosto de 1994. De esta forma, concluye la mayoría que el Tribunal aplicó un análisis "indebido" lo cual infringió la norma de autolimitación judicial. Sin embargo, esta aseveración es falsa. Ello, pues, reluce del expediente original de *P.P.D. v. Gobernador II*, que la demanda presentada por el Partido Independentista de Puerto Rico, el 3 de agosto de 1994, impugnó la constitucionalidad de la referida ley.[25] Específicamente, en la alegación número 27 de la referida demanda, en la cual se plantearon argumentos que fueron reiterados ante este Tribunal, se indicó que:

> En vista de que el esquema de financiamiento del referéndum de 1994 viola la libertad de expresión, la libertad de asociación, el derecho al voto, el debido proceso de ley, la igual protección de las leyes y varias disposiciones de la Ley Electoral, el mismo persigue un fin ilegítimo y viola por lo tanto el Artículo IV, Sección 9 de la Constitución del Estado Libre Asociado de Puerto Rico sobre el uso de fondos públicos sólo para fines público legítimos. Véase Apéndice, CE-1994-588, *Anejo II,* pág. 15.

Más grave aún, este alegado razonamiento textual, pone en evidencia un preocupante desconocimiento del texto constitucional que se interpreta. Así, la Sección 19 del Artículo II de la Constitución del Estado Libre Asociado dispone que "[l]a enumeración de derechos que antecede **no se entenderá en forma restrictiva ni supone la exclusión de**

---

[25]Asimismo, la demanda presentada por el Partido Popular Democrático de 12 de agosto de 1994 igualmente impugnó la constitucionalidad de la ley en cuestión. Esta demanda eventualmente se convirtió en el recurso CE-1994-588 que fue consolidado al atender el caso *P.P.D. v. Gobernador II*.

**otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente**". Const. P.R. Art. II, Sec. 19 (Énfasis nuestro). Con lo cual, nuestro texto constitucional contiene su propio canon interpretativo en materia de la Carta de Derechos. Específicamente, en la Sección 2 -segundo en importancia después del valor de la dignidad e igualdad del ser humano- nuestros constituyentes colocaron el sufragio señalando que éste será "universal, **igual**, directo y secreto…". Const. P.R. Art. II, Sec. 2.

Don Jaime Benítez, al presentar al seno de la Convención Constituyente el Informe sobre la Carta de Derechos explicó que este articulado constitucional recogía dos cánones de interpretación. El primero de ellos, el que nos atañe, tenía como objetivo:

> ... *proteger los derechos del individuo contra una interpretación restrictiva o contra una interpretación basada en la conocida norma de inclusio unius, exclusio alterius.* **Según este último principio interpretativo, el acto de enumerar conlleva el acto de excluir, de suerte que todo lo que no se menciona queda por ese solo hecho descartado.** No creemos que en una constitución deba incorporarse un principio de esta inflexibilidad […] Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables. (Énfasis nuestro). *Diario de Sesiones de la Convención Constituyente*, Tomo IV, pág. 2576 (1961).

El constituyente dejó meridianamente claro que esta sección de la Carta de Derecho iba dirigida, **precisamente,** a evitar

interpretaciones como la que hoy avala la mayoría. En otras palabras, los llamados textualistas/"originalistas" etc., desatienden el texto claro de la Constitución o la intención clara del constituyente. En boca de la mayoría, conceptos como "originalismo" o "textualismo" carecen de verdadero significado.

El delegado señor Benítez expresó que nuestra Carta de Derechos recoge la "*protección más liberal de los derechos del individuo*...". *Id*. Como he dicho en el pasado, somos nosotros, los **jueces puertorriqueños**, a quienes nos corresponde hacer realidad el mandato constitucional de nuestro máximo documento impartiéndole actualidad a los derechos individuales, para cumplir con nuestra obligación constitucional de proveer esa protección más abierta y **tolerante** "de los derechos del individuo". *Id*. La Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra, por lo que debemos atenernos al canon interpretativo que sus forjadores nos impusieron. Puede que no guste, pero mientras esté vigente hay que respetarla.

Todo lo cual me lleva a concluir que invocar la tesis de "análisis textualista" no es más que un subterfugio para encubrir un activismo ideológico judicial, que lleva a la mayoría a ninguear nuestra Constitución, a limitar los derechos de la ciudadanía y a abandonar precedentes

establecidos, para así obtener ventajas pasajeras en procesos electorales ideológicos. **¡Qué lástima!**

Por otra parte, es meritorio enfatizar que el valor de igualdad económica electoral ha sido ampliamente estudiado, lo cual ha logrado constatar que "una distribución de recursos extremadamente desigual puede crear la apariencia de inequidad que afectaría la legitimidad del resultado electoral". Kevin Casas-Zamora & Daniel Zovatto, *El costo de la democracia: Apuntes sobre la regulación del financiamiento político en América Latina*, Latin America Intiative Foreign Policy (Julio 2015), disponible en: https://www.brookings.edu/wp-content/uploads/2016/07/The-Cost-of-Democracy-CasasZamora-Zovatto-Spanish.pdf (última visita, 17 de abril de 2017).

Con esto en mente, la revocación del principio de igualdad económica electoral tiene el fatídico efecto de socavar la legitimación de los procedimientos electorales. Ello, aún más, cuando el proceso plebiscitario que se avecina, ha provocado gran suspicacia en el propio gobierno federal. Como sabemos, hace apenas unos días, el Departamento de Justicia de Estados Unidos rechazó avalar este evento plebiscitario ante las serias dudas provocadas por las papeletas diseñadas para utilizarse el próximo 11 de junio de 2017. El subsecretario del Departamento de Justicia, Sr. Dana J. Boente, en misiva de 13 de abril de 2017 señaló que el lenguaje contenido en la papeleta

plebiscitaria contiene "varias declaraciones ambiguas y potencialmente engañosas". Véase *United States Department of Justice review of plebiscite ballot, voter education materials, and expenditure plan*, pág. 2. (Traducción nuestra.)

En consideración a lo antes expuesto y el contexto de crisis fiscal que nos asecha, no existe lógica alguna que justifique el proceder de la mayoría de este Tribunal. Por el contrario, los pronunciamientos que hoy emite este Alto Foro sólo dejan entrever, que está muy presente el deseo de hacer posible un resultado electoral particular.

Por los fundamentos que anteceden, me veo obligada a disentir de la determinación de una mayoría de este Tribunal que sólo abona a la creación de resquicios que conminan nuestro sistema de gobierno y los principios fundamentales de la democracia. La opinión que hoy se avala, traza un derrotero lastimoso para la democracia en nuestro país que asfixia y ahoga nuestras conquistas de libertades. Hoy no somos un mejor país, de lo que éramos ayer.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>Recurrida<br><br>v.<br><br>Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced<br><br>Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves; Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Núñez y su Secretaria Ayleen Figueroa Vázquez<br><br>Peticionarios | CT-2017-002 | *Certificación Intrajurisdiccional* |

Opinión disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 19 de abril de 2017.

El reconocimiento del derecho a la igualdad en todas sus dimensiones fundamentales y constitucionales me exigen disentir por encima de cualquier otra consideración.

El axioma de igualdad electoral,[26] en su vertiente de igualdad económica, es uno claramente reconocido, no solamente por nuestro Derecho Constitucional, sino que es uno de los pilares de la igualdad en materia electoral a nivel del Derecho Internacional,[27] el cual como jueces y

---

[26]Sabido es que el principio de igualdad electoral contiene múltiples garantías aplicables a diversos contextos en la democracia, que no se limitan a la igualdad ciudadana para acceder a los cargos públicos. L. Castillo González, Los derechos de la militancia y la jurisdicción, en Democracia interna y fiscalización de los Recursos de los Partidos Políticos 59 y 73 (IFE 2006); R. Dworkin, Virtud Soberana (Paidos 2003). Asimismo, se puede valorar cuantitativamente, en la igualdad del voto. Otra dimensión donde encontramos el manejo de la igualdad, es en el acceso a la justicia electoral. También, este principio se utiliza para la igualdad de recursos, cuando se estudia el financiamiento electoral. J. Woldenberg, Vida interna de los partidos políticos y fiscalización de los recursos, nuevos retos de la autoridad electoral, en Democracia interna y fiscalización de los Recursos de los Partidos Políticos, 21 (IFE 2006). Véase C.M. Rosales, Mecanismos de financiamiento político y el control de las campañas electorales, 44 Rev. Jur. UIPR 515, 525 n. 30 y 31 (2010).

[27]Véase Declaración Universal de Derechos del Hombre, A.G. Res. 217 (III) A, N.U. Doc. A/RES/217(III) (10 de diciembre de 1948), art. 21, http://www.un.org/es/comun /docs/?symbol=A/RES/217(III); Pacto Internacional de Derechos

juezas estamos obligados a reconocer por mandato de la propia Constitución Federal. Art. IV, Const. EE. UU., LPRA, Tomo 1. Particularmente, con relación a la Declaración Universal de Derechos del Hombre y el Pacto Internacional de Derechos Políticos y Civiles de 16 de diciembre de 1966, se ha establecido lo siguiente: "[T]he foundational documents in question, are imbued with influential notions of freedom, equality, accountability, and State obligations. These rights and the notions surrounding them are the primary representations of democratic norms and political values at the international level. Money in politics must first pass through these filters". T.K. Kuhner, The Democracy to Which We Are Entitled: Human Right and the Problem of Money in Politics, 26 Harv. Hum. Rets. J. 39, 58 (2013). Sabido es que ambas normas

---

Civiles y Políticos, A.G. Res. 2200 (XXI) A, N.U. Doc. A/RES/200 (XXI) A (16 de diciembre de 1966), art. 25, http://www.un.org/es/comun/docs/?symbol=A/RES/2200(XXI)&Lang=S&Area=RESOLUTION. Véase, además, A.R. Dalla Vía, Los derechos políticos y electorales en la jurisprudencia del Tribunal Europeo y la Corte Interamericana de Derechos Humanos, Anales de la Academia Nacional de Ciencias Morales Y Políticas (2012), http://www.ancmyp.org.ar/user/files/13Dallav%C3%ADa12.pdf; A.R. Dalla Vía, Derechos políticos, normativa electoral y equidad en los procesos electorales, en Cuaderno de Capel 57, Construyendo las Condiciones de Equidad en los Procesos Electorales, Instituto Interamericano de Derechos Humanos (2012), http://www.corteidh.or.cr/tablas/r29275.pdf. Para una discusión de los derechos humanos y los asuntos económicos en los procesos políticos a nivel internacional, véase, en general, T.K. Kuhner, The Democracy to Which We Are Entitled: Human Right and the Problem of Money in Politics, 26 Harv. Hum. Rets. J. 39 (2013).

internacionales son vinculantes y recogen inexorables deberes aplicables al gobierno de los Estados Unidos. De ese modo, nótese que la igualdad electoral en su vertiente económica impone obligaciones al Estado directamente y no se limita a donantes políticos o paridad para partidos políticos, como erróneamente resuelve una Mayoría de este Tribunal.

Asimismo, cabe destacar que, en el contexto del Derecho Internacional, la *Igualdad real* y la participación en asuntos electorales no se limitan a elecciones generales, sino que se extienden a la participación en asuntos públicos. La igualdad electoral en su vertiente económica ha sido una pieza clave en la lucha por la autodeterminación de los Pueblos colonizados. Sería un contrasentido, a la luz de la realidad puertorriqueña, que la vertiente económica de la igualdad electoral esté excluida del proceso de autodeterminación de un Pueblo y que quede relegado a meramente puestos electivos. En esa línea, estudiosos del Derecho Internacional han planteado lo siguiente:

> Consider that the democratic entitlement requires "access, on general terms of equality, to public service in [one's] country," protects "the right and the opportunity without . . . distinctions [as to property, fortune, or economic status] . . . [t]o take part in the conduct of public affairs . . .," and requires all States to provide "[t]ransparent and accountable government

institutions". Kuhner, *supra*, pág. 40 (notas omitidas).

De igual forma, no podemos ignorar que este axioma de trato igualitario electoral es el que pone en práctica la salvaguarda constitucional del derecho al sufragio universal, igual, directo y secreto, y a la libre expresión de los electores en Puerto Rico. Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. Tal principio protege a los ciudadanos de toda coacción en cualquier proceso electoral, ya sea en elecciones generales, plebiscitos o referéndums.

La realidad del Derecho Constitucional y del Derecho Internacional en materia de igualdad electoral no puede ser derrotada por la intención del legislador local. Sin embargo, aun utilizando la línea argumentativa de la Mayoría, a poco examinemos la propia Exposición de Motivos de la Ley Núm. 7-2017, nos podemos percatar que la Asamblea Legislativa de Puerto Rico está consciente de los parámetros de neutralidad en el mensaje y uso de fondos públicos que, a su vez, el propio Gobierno Federal reconoció al aprobar el *Consolidated Appropriations Act, 2014*, Pub. L. No. 113-76, 128 Stat. 5. Específicamente, se reconoció de forma expresa lo siguiente:

> Después de más de un siglo de desventajas coloniales y de años de haberse realizado el Plebiscito en Puerto Rico, el Congreso y el Presidente aprobaron una asignación de $2.5 millones en el "Consolidated Appropriations Act (2014)", Ley Pública 113-76 (2014),

para proponer una consulta electoral de ratificación sobre el resultado de Estadidad del Plebiscito de 2012, ahora, a discreción del Gobierno de Puerto Rico y financiar una campaña de **"educación objetiva y no partidista a los electores en un Plebiscito"** . . . "sobre las opciones que resolverían el estatus político futuro["]. (énfasis suplido).

Ante el historial legislativo de la Ley Núm. 7-2017, y ni hablar del reconocimiento expreso del legislador en incluir las prohibiciones de la Ley Electoral, queda claro que en virtud de la legislación federal y la propia legislación local resulta obligatoria la aplicación del axioma constitucional de igualdad electoral en su vertiente económica, aun cuando la Mayoría no quiera reconocerle un rango constitucional. Es decir, bajo su mismo razonamiento tendrían que concluir que hay un mandato federal y un reconocimiento legislativo local de su aplicabilidad.

A pesar de esa realidad, hoy se revoca innecesariamente el precedente de PPD v. Gobernador II, 136 DPR 916 (1994), y se echa a la borda el acertado reconocimiento de la jurisprudencia que este Tribunal ha emitido.[28] Sobre el particular, anteriormente expresamos lo siguiente:

> [H]emos reconocido que el axioma constitucional de igualdad electoral "es susceptible de manifestarse en diversas dimensiones". PRP v. ELA, 115 DPR 631, 633

---

[28]Véanse, por ejemplo, Acevedo Vilá v. CEE, 172 DPR 971 (2007); Miranda v. CEE, 141 DPR 775 (1996).

(1984). Véase PPD v. Gobernador I, 139 DPR 643, 667 (1995). Si bien en el pasado ha sido invocado en el contexto de controversias que involucraban partidos políticos, no es exclusivo de ese contexto. Las alternativas electorales en ocasiones trascienden los márgenes de los partidos políticos. Se amplían; y con ellas los escenarios en los que el axioma constitucional de trato igualitario debe ser aplicado. No podemos constreñir su alcance. Ensancharlo es lo correcto. Frente a la "partidocracia" debe prevalecer la democracia. Guadalupe Tirado v. CEE, 165 DPR 106, 116 (2005).

Lamentablemente, el curso de acción que hoy sigue una Mayoría de este Tribunal tiene el efecto de achicar el alcance de tan importante y fundamental principio de arraigo constitucional.

Paradójicamente, en el escrutinio de una legislación que persigue atender el problema de la *Desigualdad*, este Tribunal restringe el alcance del concepto de *Igualdad*. Ahora queda en manos del partido político que controle las Ramas Políticas establecer los parámetros, si alguno, en torno al uso de fondos públicos relacionados con eventos electorales. El organismo administrativo electoral —la Comisión Estatal de Elecciones— no podrá incluir en el ejercicio responsable de su *expertise* salvaguardas constitucionales adicionales al derecho del sufragio universal que no estén contempladas textualmente y escritas en piedra en la Constitución; peor aún, la ciudadanía no contará con la protección oportuna de la Rama Judicial. Anteriormente, he advertido que esa lectura

del Derecho Constitucional convierte las garantías ciudadanas que emanan de la Constitución en meramente un cementerio de palabras. Hoy la *Igualdad* se acerca más a la tumba del cementerio constitucional con acciones como éstas. Como situación agravante, se elimina la posibilidad de impugnar de su faz normas reglamentarias y resoluciones de la naturaleza que nos ocupa, y la ciudadanía tendrá que esperar y probar que se sufran daños particulares en el evento electoral para tener algún éxito en el reclamo de *Igualdad*.

Esas son algunas de las múltiples consecuencias que acarrea la actuación de revocar un precedente firmemente establecido por más de dos décadas y, sorprendentemente, debilitar estos principios constitucionales consustanciales a la existencia de la democracia misma.

No puedo perder de perspectiva el Estado de Derecho que ha regido los eventos electorales en la historia moderna, así como nuestros pronunciamientos y las protecciones que hemos concedido cuando los principales movimientos ideológicos en Puerto Rico han invocado el axioma constitucional de igualdad electoral, en su vertiente de igualdad económica, en aspectos relacionados al "status", y no solamente a elecciones generales, como se ha restringido en el día de hoy. A modo de ejemplo, el

Partido Nuevo Progresista (PNP) ha realizado reclamos dirigidos a cuestionar el uso de fondos públicos para cabildear en contra de la estadidad. Para ello, la representación legal del PNP, al igual que su liderato, consecuentemente han invocado la prohibición de uso indebido para fines no-públicos y el axioma constitucional de igualdad económica. Véase, a modo de ejemplo, Recurso de Certificación Intrajurisdiccional, PNP v. ELA, CT-2016-11; PNP v. Hon. Sila M. Calderón, 162 DPR 239 (2004) (Sentencia).

Desde mis estudios de Derecho, como abogado y como juez, he conocido, reconocido y aplicado el axioma de la igualdad electoral en su vertiente económica como uno de los pilares del concepto de la *Igualdad* y como una garantía del Derecho Internacional y Constitucional. Ello, precisamente, para garantizar la autodeterminación de los Pueblos y evitar desigualdades en procesos electorales relacionados y no limitados a elecciones de puestos públicos. Es lo correcto en Derecho ayer, hoy y siempre, por lo que consecuentemente disiento y, en su lugar, hubiese fortalecido y no debilitado el axioma de igualdad electoral en su vertiente económica, de conformidad con la base legal constitucional e internacional expuesta.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>    Recurridos<br><br>        v.<br><br>Comisión Estatal de Elecciones por conducto de su Presidenta, Liza García Vélez y Otros<br><br>    Recurridos<br><br>Estado Libre Asociado de Puerto Rico por conducto de la Secretaria de Justicia, Wanda Vázquez Garced<br><br>    Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente, Hon. Thomas Rivera Schatz y Otros<br><br>    Peticionarios | CT-2017-002 | Certificación |

Opinión Disidente emitida por el Juez Asociado señor Colón Pérez.

En San Juan, Puerto Rico, a 19 de abril de 2017.

> *¿Será que nuevamente el vaivén de las olas arropa el entendimiento y provoca un tracto jurisprudencial zigzagueante y dúctil?*
>
> Op. Disidente Juez Asociada señora Rodríguez Rodríguez en *Asoc. Fotoperiodistas v. Rivera* Schatz, 180 DPR 920, 974 (2011).

En el día de hoy, arropados nuevamente por el mecimiento descontrolado y desmesurado de lo que hace ocho (8) años algunos miembros de este Tribunal proclamaron como el "*flujo normal de la marea judicial*", este Foro pierde la oportunidad única de reiterar sus pronunciamientos, de hace más de dos (2) décadas, en materia de igualdad electoral ante la celebración de un referéndum. Esta vez, extendiendo la referida normativa al contexto de un plebiscito.

Específicamente, nos correspondía determinar si, ante la celebración de un plebiscito a celebrarse el próximo 11 de junio de 2017, y de la posible celebración de un referéndum a llevarse a cabo el 8 de octubre del mismo año, se hacían extensivas a las agencias del Estado Libre Asociado de Puerto Rico las prohibiciones establecidas en el Art. 12.001 de la Ley Electoral de Puerto Rico, *infra*. Estas prohibiciones tienen el efecto de impedir que, salvo autorización expresa de la Junta Examinadora de Anuncios (en adelante, "J.E.A."), tales agencias incurran en gastos para la compra de tiempo y espacio en los medios de comunicación del País, así como para la compra o distribución de materiales propagandísticos o promocionales con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones y/o planes. Lo anterior, con excepción, claro está, de aquellos avisos y anuncios de prensa expresamente requeridos por ley, ciertas campañas de la Compañía de Turismo, así como

aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones (en adelante, "C.E.E.").

Contrario a lo señalado por una mayoría de este Tribunal -- y conforme al axioma de igualdad electoral contenido en la Constitución del Estado Libre Asociado de Puerto Rico y a lo resuelto por este Tribunal en los casos *P.P.D. v. Gobernador I, infra*, y *P.P.D. v. Gobernador II, infra,* --, en el contexto de los eventos electorales a celebrarse en los meses de junio y, posiblemente, en octubre de 2017, tal prohibición era una válida y cónsona con la salvaguarda constitucional al derecho de sufragio universal, igual, directo y secreto, y a la libre expresión de los electores y las electoras en nuestro País.

Por no ser ese el curso de acción seguido por una mayoría de este Tribunal, **disentimos**.

La postura que asume una mayoría de esta Curia, al amparo de una lectura desacertada, literal y positivista de las provisiones legales aplicables y de las salvaguardas contenidas en la Constitución del Estado Libre Asociado de Puerto Rico, conlleva la revocación de uno de nuestros *stare decisis* mejores pensados y estructurados en materia de derecho electoral. Como si ello no fuera suficiente, tal dictamen acarrea, indudable e inequívocamente, un atentado contra el derecho fundamental de cada puertorriqueño y

puertorriqueña al voto, libre de coacción por parte del Estado.

Esta nefasta actuación tiene el efecto de permitir que las agencias del Estado se arroguen de fondos públicos en el contexto de la celebración de eventos eleccionarios. Con su actuación, una mayoría de este Tribunal avala que el partido político que ostenta el poder utilice los fondos públicos para interferir -- intencionalmente -- con el libre derecho al voto de los puertorriqueños y puertorriqueñas, a ser depositado en las urnas de la democracia, socavando así los pilares del esquema electoral de nuestro País. Nuestra conciencia nos impide avalar tal proceder.

I.

La controversia ante nuestra consideración surge a raíz de la aprobación de la Ley Núm. 7 de 3 de febrero de 2017, conocida como la *Ley para la Descolonización Inmediata de Puerto Rico* (en adelante, "Ley Núm. 7-2017"). Conforme al referido estatuto, la Asamblea Legislativa de Puerto Rico autorizó la celebración de dos eventos electorales, a saber: (1) un *plebiscito*, a celebrarse el próximo 11 de junio de 2017, mediante el cual los electores debidamente inscritos podrán votar entre "Estadidad" y "Libre Asociación/Independencia"

como opciones de estatus político (en adelante, "Plebiscito"); y (2) en caso de prevalecer la opción de "Libre Asociación/Independencia", un *referéndum*, a celebrarse el 8 de octubre de 2017, para seleccionar el tipo de relación soberana, ya sea "Libre Asociación" o "Independencia" (en adelante, "Referéndum").

A raíz de lo anterior, la Comisión Estatal de Elecciones de Puerto Rico (en adelante, "C.E.E.") celebró una reunión ordinaria, en la cual el Comisionado Electoral Interino del Partido Popular Democrático, el señor Miguel Ríos Torres (en adelante, "Comisionado Electoral del PPD"), presentó una solicitud para que -- en vista de los eventos electorales antes mencionados -- se activase la J.E.A. Ello, al amparo del Art. 12.001 de la Ley Núm. 78 de 1 de junio de 2011, según enmendada, Ley Electoral de Puerto Rico, *infra* (en adelante, "Ley Núm. 78-2011").

A dicha solicitud, la Comisionada Electoral del Partido Nuevo Progresista, la señora Norma E. Burgos Andújar (en adelante "Comisionada Electoral del PNP"), se opuso. Ésta alegó que la Ley Núm. 7-2017 era silente en cuanto a la activación de la J.E.A. y que el Art. 12.001 de la Ley Núm. 78-2011, *infra*, era aplicable únicamente a las elecciones generales, por lo que entendió que la activación de tal ente no procedía ante la celebración del Plebiscito.

Así las cosas, ante la falta de unanimidad entre los Comisionados Electorales[29] y conforme al procedimiento

---

[29] Al momento en que se suscitó la controversia ante nuestra consideración, solo estuvieron presentes dos Comisionados Electorales, a saber, uno por el Partido Popular Democrático y otro por el Partido Nuevo Progresista. Ello, a

establecido en la Ley Núm. 78-2011, *infra*, la controversia quedó sometida para la consideración de la Presidenta de la C.E.E., quien, oportunamente, emitió la Resolución C.E.E.-RS-17-07 (en adelante, "Resolución de la C.E.E.") y dispuso de las controversias presentadas ante su consideración. Al así hacerlo, mediante el referido documento, la Presidenta de la C.E.E. activó la veda electoral para la difusión de anuncios gubernamentales contenida en el Art. 12.001 de la Ley Núm. 78-2011, *infra*, hasta el 12 de junio del año vigente; día después del Plebiscito. Por otra parte, dispuso que en caso de que fuese necesaria la celebración del Referéndum, la referida prohibición estará vigente hasta el 9 de octubre de 2017. Por último, y cónsono con lo anterior, ordenó se constituyera la J.E.A.; ente encargado de hacer valer lo dispuesto en el mencionado Art. 12.001 de la Ley Núm. 78-2011, *infra*.

Inconforme con dicho proceder, y tras la oportuna presentación de una solicitud de reconsideración ante la Presidenta de la C.E.E., -- la cual fue denegada -- la Comisionada Electoral del PNP presentó un recurso de *Revisión Judicial* ante el Tribunal de Primera Instancia, impugnando la Resolución de la C.E.E. En síntesis, la Comisionada Electoral del PNP solicitó que se dejara sin efecto el mencionado dictamen, por entender que las

---

raíz de los resultados de las elecciones generales celebradas en noviembre de 2016.

disposiciones contenidas en el Art. 12.001 de la Ley Núm. 78-2011, *infra*, son de aplicación exclusiva a la celebración de elecciones generales, no así al Plebiscito y/o Referéndum.

Así pues, y mientras el caso se encontraba pendiente ante el Tribunal de Primera Instancia, el Senado de Puerto Rico, por conducto de su Presidente, Hon. Thomas Rivera Schatz, y su Secretario, Manuel Torres Nieves, junto a la Cámara de Representantes de Puerto Rico, por conducto de su Presidente, Hon. Carlos Méndez Núñez, comparecieron ante este Tribunal mediante una solicitud de *Certificación*. En la misma, nos solicitaron que certificáramos el presente caso, de modo que este Tribunal pudiera atender, en primera instancia, los asuntos planteados ante el foro primario.

El mismo día, compareció ante nos la Comisionada Electoral del PNP, uniéndose a la mencionada solicitud y adoptando los fundamentos expuestos por el Senado de Puerto Rico, su Presidente y Secretario, la Cámara de Representantes de Puerto Rico y su Presidente.

Luego de que este Tribunal acogiera la solicitud de certificación, y tras los trámites de rigor, las partes en el presente pleito presentaron sus respectivos alegatos. En ellos, la C.E.E. alega que, por ser el ente designado por ley para resolver asuntos electorales, estaba autorizada a reglamentar todo lo relativo al proceso electoral en el País; ello, en salvaguarda al derecho al

voto de los ciudadanos. Asimismo, arguyó que las disposiciones de la Ley Núm. 7-2017 eran compatibles con la Ley Núm. 78-2011, *infra*, en lo relacionado a la veda electoral. Particularmente, esboza que anteriormente este Tribunal ya había resuelto una controversia idéntica a la presente y, allí, determinó que la veda electoral sobre difusión de anuncios por parte del Estado, y sufragados con fondos públicos, era aplicable a un evento de referéndum.

La Comisionada Electoral del PNP, por su parte, arguye que activar la veda electoral a referéndums y plebiscitos tendría el efecto de "*paralizar*" la capacidad del Estado Libre Asociado de comunicar sus políticas públicas e informar a la ciudadanía. En consecuencia, sostiene que la prohibición contenida en el Art. 12.001 de la Ley Núm. 78-2011, *infra*, era de aplicación exclusiva a las elecciones generales en el País.

Por otro lado, el Comisionado Electoral del PPD, en síntesis, entiende que el asunto ante nuestra consideración no es uno novel, sino que ya se había resuelto por este Tribunal hace años atrás. Así, expresó que cónsono con lo resuelto en *P.P.D. v. Gobernador II, infra*, y según el texto claro de la Ley Núm. 7-2017, la veda electoral aplica a los asuntos electorales a celebrarse el 11 de junio y 8 de octubre de 2017, de ser este último necesario. Por ello, sostuvo la procedencia de la constitución de la J.E.A.

De igual forma, la Comisionada Electoral del Partido Independentista Puertorriqueño, la licenciada  María de

Lourdes Santiago Negrón (en adelante, "la Comisionada Electoral del PIP"), compareció ante nos. En su alegato, y en lo aquí pertinente, sostiene que la propia Ley Núm. 7-2017 incorporó, de forma literal, lo dispuesto en la Ley Núm. 78-2011, *infra*, en cuanto a los delitos y prohibiciones. Por ello, es de la opinión que la veda electoral contenida en el Art. 12.001 de nuestro estatuto electoral vigente, *infra,* por ser un tipo de prohibición, aplica a los eventos electorales a celebrarse en junio y octubre del año corriente. Asimismo, alega que este Tribunal ya ha resuelto situaciones como la presente, al amparo del principio de igualdad económica electoral.

De otra parte, en su comparecencia, el Procurador General del Estado Libre Asociado de Puerto Rico (en adelante, "Procurador General") presentó su oposición a la Resolución de la C.E.E. En esencia, el E.L.A. argumenta que en nuestro estado de derecho existe una facultad delegada al Estado de comunicar e informar a los ciudadanos del País sobre los programas gubernamentales y que, si bien reconoce no poseer un derecho a la libertad de expresión, cualquier limitación a esta facultad debe ser observada con cautela. Además, sostiene que nada de lo resuelto por este Tribunal apoya la activación de la J.E.A. en periodos en los que no se celebre una elección general.

En escrito separado, el Senado de Puerto Rico, su Presidente y su Secretario, alegaron, en síntesis, que las disposiciones de la Ley Núm. 7-2017 eran incompatibles con

la prohibición contenida en el Art. 12.001 de la Ley Núm.78-2011, *infra*, por lo que prevalecía la primera; ello, por tratarse de una ley especial. Asimismo, sostienen que en *P.P.D. v. Gobernador II*, *infra*, esta Curia determinó que la prohibición contenida en el estatuto electoral vigente en aquel entonces no se extendía a años en que no se celebrara una elección general.

Por último, la Cámara de Representantes de Puerto Rico, su Presidente y su Secretario, también presentaron su correspondiente alegato. En el mismo, entre otras, plantean que para determinar si era o no aplicable la veda electoral contenida en la Ley Núm. 78-2011, *infra*, no era necesario solamente realizar una distinción entre los distintos eventos electorales -- a saber, una elección general, un plebiscito y un referéndum -- sino que, además, la naturaleza del referéndum debía tomarse en consideración. Así, arguyó que lo resuelto en otras ocasiones por este Tribunal, en contextos similares al presente, no es de aplicación.

II.

De entrada, es menester aclarar que, contrario a lo que pretende intimar una mayoría de este Tribunal, este Foro -- como último intérprete de la Constitución del Estado Libre Asociado de Puerto Rico -- puede y debe recurrir al texto de la misma en todas aquellas

circunstancias en las que ello sea meritorio. Precisamente, al desplegar tal facultad revisora e interpretar así los contornos de nuestra Constitución, "***debemos garantizar su vigorosidad y relevancia ante los problemas sociales, económicos y políticos actuales***". (Énfasis suplido). *Misión Ind. P.R. v. J.P.*, 146 DPR 64, 91 (1998). *Véanse* además, *Nogueras v. Hernández Colón I*, 127 DPR 405 411 (1990); *P.I.P. v. C.E.E.*, 120 DPR 580, 613 (1988); *López Vives v. Policía de P.R.*, 118 DPR 219, 227 (1987). La contención en contrario, relativa a que no podemos ejercer tal función "*sin la correspondiente solicitud de las partes*", Op. pág. 13, resulta en una anomalía a nuestro rol como tribunal de última instancia. Una vez aclarado lo anterior, procedemos a discutir el derecho aplicable -- y obviado por esta mayoría -- a la controversia ante nos.

III.

Como es sabido, y en lo pertinente a la controversia que nos ocupa, la Constitución del Estado Libre Asociado de Puerto Rico, al igual que la Constitución de los Estados Unidos de América[30], consagra como principio fundamental en

---

[30] En lo aquí pertinente, la Enmienda XIV de la Constitución de los Estados Unidos de América establece lo siguiente:

> Ningún estado aprobará o hará cumplir ninguna ley que restrinja los privilegios o inmunidades de los ciudadanos de los Estados Unidos; ni ningún estado privará a persona alguna de su vida, de su libertad o de su propiedad, sin el debido procedimiento de ley, ni negará a nadie, dentro de su jurisdicción, la igual protección de las leyes. Emda. XIV, Const. EE.UU, LPRA, Tomo I, ed. 2016, págs. 207-208.

nuestra vida de Pueblo el derecho a la igualdad e igual

protección de las leyes. Al respecto, el Art. II, Sec.

1, de nuestra Carta Magna señala que:

> La dignidad del ser humano es inviolable.
> Todos los hombres son iguales ante la Ley. No
> podrá establecerse discrimen alguno por motivo
> de raza, color, sexo, nacimiento, origen o
> condición social, ni ideas políticas o
> religiosas. Tanto las leyes como el sistema de
> instrucción pública encarnarán estos
> principios de esencial igualdad humana. Sec.
> 1, Art. II, Const. E.L.A., LPRA, Tomo 1, ed.
> 2016, pág. 275.

Según dispuesto en el *Diario de Sesiones de la Convención*

*Constituyente,* entre los principios que inspiraron a los

fundadores y fundadora de nuestra Constitución al momento de

redactar la referida cláusula constitucional se encontraban:

> […] fijar claramente como base consustancial de todo
> lo que sigue el principio de la dignidad del ser
> humano y, como consecuencia de ésta, la igualdad
> esencial de todas las personas dentro de nuestro
> sistema Constitucional. La igualdad ante la ley
> queda por encima de accidentes o diferencias, bien
> tengan su origen en la naturaleza o en la cultura.
> Todo discrimen o privilegio contrario a esta
> esencial igualdad repugna al sistema jurídico
> puertorriqueño. En cuanto fuera menester nuestra
> organización legal queda robustecida por la presente
> disposición constitucional, a la vez que obligada a
> ensanchar sus disposiciones para dar plena
> realización a lo aquí dispuesto. *Informe de la
> Comisión de la Carta de Derechos, Diario de Sesiones
> de la Convención Constituyente*, Tomo 4, p. 2561,
> Equity (1962).

Cónsono con lo anterior, en aras de darle significado y

vida a la referida disposición constitucional, y en el

contexto de las controversias que nos ocupan, hemos

establecido que la igualdad "*[p]or su naturaleza dinámica*

*es susceptible de manifestarse en diversas dimensiones".* *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 666-667 (1995), citando a *P.R.P. v. E.L.A.*, 115 DPR 631, 633 (1984). **Una de estas manifestaciones lo es la igualdad electoral.**

El principio de igualdad electoral está celosamente resguardado en nuestro ordenamiento constitucional en el Art. II, Sec. II de la Constitución del Estado Libre Asociado de Puerto Rico. *Véase* Art. II, Sec. 2, Const. E.L.A., LPRA, Tomo I, ed. 2016, pág. 283. Dicho articulado garantiza la expresión de la voluntad del Pueblo mediante el sufragio universal, igual, directo y secreto, y protege al ciudadano y ciudadana contra toda coacción en el ejercicio de su prerrogativa electoral. *Íd.*

Como se puede apreciar, bien se puede decir que, en su contenido, el Art. II, Sec. 2 de nuestra Constitución, *Íd.*, consagra el principio fundamental de que el poder político en nuestro ordenamiento constitucional emana del consentimiento y la voluntad de los ciudadanos y las ciudadanas del País. Este precepto constitucional le impone al Gobierno una responsabilidad dual: "*la de abstenerse, por un lado, de interferir con el ejercicio del sufragio universal, igual, directo y secreto, y por otro, la de proteger al ciudadano contra toda coacción en el ejercicio de tal prerrogativa electoral".* *P.P.D. v. Gobernador I,* 139 DPR en la pág. 670 (1995); *Sánchez y Colón v. E.L.A. I*, 134 DPR 445, 449-450 (1993).

Específicamente, este Tribunal, al expresarse en torno a tal postulado, ha establecido lo siguiente:

> **Estos postulados constitucionales protegen y garantizan el derecho al sufragio universal, tanto en las elecciones generales como en los referéndums[s] y en los plebiscitos.** Aunque no es derecho de carácter absoluto y la Legislatura tiene amplia facultad para reglamentarlo, **le corresponde a los tribunales la responsabilidad de asegurar que la legislación promulgada cumpla con las garantías constitucionales.** Al descargar esta responsabilidad tenemos que hacer un delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar su ejercicio para que el proceso se conduzca ordenadamente con la mayor participación de electores en igualdad de condiciones. *Cada decisión debe tomarse con cuidado, atendiendo a las circunstancias particulares de cada caso. Como principio general, aquella legislación que sea onerosa y afecte sustancialmente el derecho al sufragio es susceptible de impugnación constitucional. (Énfasis suplido). Íd.*

En ese sentido, vale la pena señalar que una de las herramientas con las cuales históricamente se ha procurado garantizar la igualdad electoral en nuestro País lo es el Art. 12.0001 de la Ley Núm. 78-2011, 16 LPRA sec. 4231, antes denominado Art. 8.0001 de la Ley Electoral de Puerto Rico de 1977, Ley Núm. 4 de 20 de diciembre de 1977, 16 LPRA sec. 3351 (en adelante, "Ley Electoral de 1977")[31]. En

---

[31] El mencionado Art. 8.001 de la Ley Electoral de Puerto Rico de 1977, Ley Núm. 4 de 20 de diciembre de 1977, 16 LPRA sec. 3351, derogado por el Art. 12.001 de la Ley Núm. 78-2011, Ley Electoral del Estado Libre Asociado de Puerto Rico, disponía de la siguiente forma:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro. de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esa disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

lo pertinente a la controversia ante nos, la referida disposición legal establece que:

> Durante el año en que se celebre una elección general y hasta el día siguiente a la fecha de la celebración de la misma, se prohíbe a las agencias del Gobierno, a la Asamblea Legislativa y a la Rama Judicial de Puerto Rico incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación, así como para la compra y distribución de materiales propagandísticos o promocionales con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley; las campañas de la Compañía de Turismo para promoción del turismo interno, campañas de promoción fuera de Puerto Rico por parte de la Compañía de Turismo de Puerto Rico o la Autoridad de Distrito del Centro de Convenciones de Puerto Rico promocionando a la isla de Puerto Rico como destino turístico, o la Compañía de Fomento Industrial promocionando la inversión del extranjero en Puerto Rico, siempre que no incluyan relaciones de logros de la administración o la corporación ni se destaque la figura de ningún funcionario. Además, se excluyen las notificaciones o convocatorias para procesos de vistas públicas legislativas o administrativas que se publique y circule sin usar los medios de difusión masiva pagados.
>
> Asímismo [sic.], se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán

---

Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. 16 LPRA sec. 3351.

permitidos previa autorización al efecto de la Comisión.

En el caso de los anuncios o avisos que son requeridos por ley, a las agencias del Gobierno, a la Asamblea Legislativa y a la Rama Judicial de Puerto Rico, así como a los municipios, la Comisión tendrá un término de dos (2) días laborables para expresar por escrito su aprobación o reparo, al aviso o anuncio para el cual se solicitó la autorización. El término antes mencionado se contará a partir del momento de la solicitud de autorización a la Comisión, y en caso de que el mismo expire sin que la Comisión haya expresado su aprobación o reparo, se dará por autorizado el mensaje, aviso o anuncio en cuestión; y no será necesaria la emisión de documentos de aprobación por parte de la Junta.

Las disposiciones de esta sección no serán de aplicación al cargo de Comisionado Residente, las que se regirán por lo estatuido en la Ley Federal de Elecciones 2 U.S.C. § 441 (a)(1)(A) et seq.

La violación de esta sección conllevará a la agencia o dependencia gubernamental una multa administrativa de hasta diez mil (10,000) dólares por la primera infracción y hasta veinticinco mil (25,000) dólares por infracciones subsiguientes. Los fondos que se obtengan bajo este concepto, pasarán a formar parte del fondo especial para el financiamiento de los gastos de automatización de los procesos electorales, según se dispone en la sec. 4011 de este título.

Como se puede apreciar, la puesta en vigor del Art. 12.001, antes Art. 8.001 de la Ley Electoral de 1977, tuvo el efecto de, salvo contadas excepciones autorizadas por la J.E.A., restringir la divulgación de información por parte del Estado Libre Asociado durante la celebración de las elecciones generales en el País. Dicho de otra forma,

el referido estatuto tuvo la "*intención legislativa de excluir definitivamente del proceso político la influencia solapada que el partido en el poder pueda tener mediante el uso de los anuncios gubernamentales*". *P.P.D. v. Gobernador I*, *supra*, a las págs. 682-683, citando con aprobación a *C.E.E. v. Depto. de Estado*, 134 DPR 927, 939 (1993)[32]. Disposiciones como ésta reflejan "*el interés en descontinuar durante el período eleccionario la práctica de las agencias gubernamentales de hacer campaña política mediante la publicación de anuncios sobre sus logros y planes*". *P.P.D. v. Gobernador I*, *supra*, a la pág. 683, citando a *C.E.E. v. Depto. de Estado*, *supra*, a la pág. 939.

Notamos, pues, que al igual que bajo el esquema previamente establecido mediante el derogado Art. 8.001 de la Ley Electoral de 1977, *supra*, el nuevo Art. 12.001 de la Ley Núm. 78-2011, *supra*, -- el cual, en esencia, adelanta el mismo espíritu que su predecesor -- busca evitar que el Estado Libre Asociado y sus agencias, mediante la utilización de fondos públicos, influyan de alguna forma en la libre expresión y selección de los ciudadanos y ciudadanas que participan en los eventos electorales del País. Sobre el particular, *véase* 1er Informe  de la Comisión Especial  sobre la Reforma

---

[32] Tales expresiones, en referencia al antiguo Art. 8.001 de la Ley Electoral de 1977, *supra*, derogado por el actual Art. 12.001 de la Ley Núm. 78-2011.

Gubernamental rendido con enmiendas sobre el Sustitutivo de la Cámara al P. de la C. 1863, 10 de noviembre de 2010, 4ta Sesión Ordinaria, 16ta Asamblea Legislativa, pág. 25[33].

Así pues, en aras de garantizar el fiel cumplimiento de lo dispuesto en el Art. 12.001 de la Ley Núm. 78-2011, *supra*, -- y similar a como se hacía cuando estaba vigente el Art. 8.001 de la Ley Electoral de 1977, -- en virtud de la Sec. 2.1 del Reglamento para el Control de Gastos de Difusión Pública del Gobierno de la Comisión Estatal de Elecciones de 14 de octubre de 2015, se estableció la J.E.A. Así, se le concedió a dicho organismo la encomienda de evaluar toda solicitud de autorización de difusión de anuncios presentada por el gobierno de Puerto Rico en las elecciones generales. *Íd.*, Sec. 2.3, pág. 6.

Ahora bien, es menester señalar que la activación de la veda electoral para la difusión de anuncios gubernamentales contenida en el Art. 12.001 de la Ley Núm. 78-2011, no solo se limita a la celebración de elecciones generales, como pretende sugerir su texto. Al respecto, y para entender el alcance de esta prohibición, conviene repasar las interpretaciones -- a nuestro juicio, correctas y completas -- que del Art. 8.001 de la Ley

---

[33] Allí, la Comisión Especial sobre la Reforma Gubernamental expresó que el proyecto de ley -- eventualmente, tras su aprobación y firma, convertido en la Ley Núm. 78-2011 -- tenía como fin, entre otro, *"[g]arantizar a los electores, la reducción del gasto público en campañas políticas, así como reducir al mínimo la intervención con la voluntad del electorado de elementos ajenos al proceso electoral".* 1er Informe de la Comisión Especial sobre la Reforma Gubernamental rendido con enmiendas sobre el Sustitutivo de la Cámara al P. de la C. 1863, 10 de noviembre de 2010, 4ta Sesión Ordinaria, 16ta Asamblea Legislativa, pág. 25.

Electoral de 1977 realizó este Tribunal en los casos *P.P.D. v. Gobernador I, supra,* y *P.P.D. v. Gobernador II*, 136 D.P.R. 916 (1994).

En *P.P.D. v. Gobernador II*, *Íd.*, este Tribunal tuvo ante su consideración una situación de hechos muy similar a la que hoy nos atañe. En aquella ocasión, se impugnó la validez de la Ley Núm. 49 de 2 de agosto de 1994, también conocida como Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994 (en adelante, "Ley Habilitadora"), mediante la cual se autorizó la celebración de un referéndum para que los electores inscritos manifestaran su aprobación o rechazo a unas enmiendas propuestas a varias secciones y artículos de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*.

En lo aquí relacionado, los demandantes solicitaron que se le ordenara al Gobernador de Puerto Rico y a las corporaciones públicas demandadas, junto a los correspondientes funcionarios públicos, detener las campañas publicitarias realizadas por estos a través de los medios de difusión pública del País. Ello, al amparo del Art. 8.001 de la Ley Electoral de 1977, *supra*.

En dicha ocasión, el foro primario determinó que el referido artículo de la Ley Electoral de 1977 tenía vigencia en relación al referéndum programado en Puerto Rico, por lo que ordenó a la C.E.E. a nombrar la Junta de Anuncios que habría de evaluar la necesidad de publicación

de todo anuncio gubernamental hasta el día después del referéndum. Ello, al amparo del principio de igualdad económica inmerso en la Constitución del Estado Libre Asociado de Puerto Rico.

Así las cosas, este Tribunal se expresó en torno a la aplicabilidad de la prohibición contenida en el antiguo Art. 8.001 de la Ley Electoral de 1977, *supra*, al referéndum a celebrarse en el País, conforme a la Ley Habilitadora. En aquel entonces, expresamos que, al amparo del Art. II, Sec. 2 del Art. II de nuestra Constitución, Const. E.L.A., *supra*, y la intención que tuvo la Convención Constituyente al redactar la misma, el derecho constitucional al sufragio es "**un elemento común a las elecciones generales y los referéndum[s]**". (Énfasis suplido). *P.P.D. v. Gobernador II*, 136 DPR a la pág. 925. *Véase* además, *Sánchez y Colón v. E.L.A.*, 134 D.P.R. en la pág. 449. Asimismo, establecimos que el derecho constitucional del sufragio "*es consustancial con la existencia misma de la democracia*", por tratarse de un derecho que está presente tanto en las elecciones generales como en los referéndums. *P.P.D. v. Gobernador II*, *supra*. **Ese elemento común, -- el derecho constitucional al sufragio -- sin duda alguna, también está presente en los plebiscitos.**

Posteriormente, un año después, en *P.P.D. v. Gobernador I, supra*[34], se alegó la violación a los principios más esenciales del derecho al voto, ante la utilización de fondos públicos por parte del Estado o un Municipio para pagar anuncios que tenían el propósito de beneficiar al partido político en poder o a los candidatos de tal partido, tanto a nivel estatal como municipal.

En lo aquí pertinente, este Tribunal reafirmó la norma a los efectos de que el axioma constitucional de igualdad electoral queda protegido en nuestro ordenamiento. Asimismo, hicimos énfasis en la protección brindada a dicho axioma por nuestra Asamblea Legislativa, mediante el esquema electoral establecido en Puerto Rico. En aquel entonces, establecimos que el Art. 3.023 de la Ley Electoral de 1977, 16 LPRA sec. 3116, tenía el propósito de salvaguardar dicho principio de igualdad electoral, al otorgarle un trato igual a los partidos políticos en la asignación anual de fondos públicos para su funcionamiento. *Véase P.P.D. v. Gobernador I,* 139 D.P.R. en la pág. 667.

Al evaluar la "*estrecha relación*" entre la Sec. 9 del Art. VI de nuestra Constitución, *supra*, y el axioma de

---

[34] Es menester señalar que, contrario a lo intimado por el Gobierno de Puerto Rico en su Alegato, en *P.P.D. v. Gobernador I*, 139 DPR 643 (1995), la situación de hechos era una distinta a la presente. Allí, si bien se impugnó explícitamente la utilización de fondos públicos para sufragar la publicación de anuncios, ello **no se dio en el contexto de la celebración de una elección general, referéndum, plebiscito o cualquier otro evento electoral.** Por el contrario, se dio en el contexto de un año en el cual la veda electoral contenida en el antiguo Art. 8.001 de la Ley Electoral de 1977 era inaplicable, puesto que la misma solo cobraba vigencia durante la ocurrencia de algún evento electoral; ya sea una elección general, un plebiscito y/o referéndum, por ejemplo.

igualdad electoral en su vertiente de igualdad económica,

dispusimos lo siguiente:

> **En la medida en que se subvencione una campaña político-partidista con fondos públicos, se le permite una ventaja a un partido (o candidato político) sobre otros, lo que atenta contra el axioma de igualdad electoral y socava los pilares del esquema electoral en nuestro País, el cual garantiza la igualdad económica entre los partidos <u>sin limitarlo al período eleccionario</u>.** Esto afecta detrimentalmente [sic.], además, el derecho de los electores a ejercer su voto libre de cualquier coacción, toda vez que como componentes esenciales de los partidos son colocados en la misma desventaja económica que su partido frente al que subvencionó parte de su campaña política con los fondos de todo el Pueblo de Puerto Rico, incluso los de esos electores pertenecientes a cualquier partido de oposición del Gobierno actual. (Énfasis nuestro). *Íd.*, a la pág. 671.

Siendo ello así, no existe duda -- tal y como resolvimos

en *P.P.D. v. Gobernador II*, *supra,* -- de que el principio de

igualdad inmerso en nuestra Constitución se manifiesta, entre

otras, en los asuntos electorales, trátese de una elección

general, plebiscito o referéndum. Así pues,

> [e]l concepto de igualdad económica, con relación a la distribución de fondos públicos en el proceso electoral, impide que un partido que ostente el poder de gobernar al pueblo en un momento dado utilice fondos públicos para tomar ventaja indebida dirigida a promover su postura. El Art. 8.001 [de la Ley Electoral de 1977], *supra*, es precisamente una medida preventiva para que no ocurra dicha práctica indebida. Por lo tanto, el referido artículo, **por imperativo del axioma de igualdad inmerso en la Constitución, así como en protección del derecho constitucional a la libre selección traducido en el derecho al sufragio, resulta compatible y consecuentemente aplicable a la Ley Habilitadora del Referéndum.** En aras de mantener un proceso democrático, **no podemos permitir una ventaja indebida del**

**partido que esté en el Gobierno para promover su postura mediante la utilización de fondos públicos.** (Énfasis suplido). *P.P.D. v. Gobernador II*, *supra*, a la pág. 926.

En fin, si hace veinte (20) años -- en salvaguarda al principio de igualdad electoral y la paridad económica de los partidos políticos -- resolvimos que la prohibición contenida en el Art. 8.0001 de la Ley Electoral de 1977, *supra*, era extensiva a un evento de referéndum a celebrarse en el País, igual garantía estamos obligados a extenderle a los eventos electorales que se avecinan; entiéndase, el Plebiscito del 11 de junio de 2017 y el posible Referéndum del 8 de octubre del mismo año.

Nótese que las elecciones generales, los plebiscitos y los referéndums tienen un elemento común. Buscan, mediante el ejercicio del voto, auscultar el sentir de la ciudadanía sobre distintos asuntos de vital importancia. En una elección general se elige a los representantes del Pueblo; en el plebiscito, se adoptan decisiones fundamentales sobre la estructura o forma del Estado; y en el referéndum, se expresa sobre cualquier asunto sometido a su consulta, como por ejemplo: asuntos de naturaleza constitucional y/o legislativa, o relativos a decisiones de naturaleza política. *Véase* Art. 2.003, incisos (31), (82) y (86), respectivamente, de la Ley Núm. 78-2011, *supra*.

Es evidente entonces, que todas tienen un elemento común: convocar al pueblo para que mediante el ejercicio del voto se expresen sobre un tema trascendental. Al ser eventos tan

similares e involucrar el derecho al voto como vehículo de expresión, no cabe hacer distinción entre ellos a los efectos de cumplir, en el plebiscito, con el mandato constitucional que identificamos en *P.P.D. v. Gobernador II*, *supra*. Lo contrario -- es decir, no aplicar la veda electoral al Plebiscito pero, meses más tardes, sí aplicar tal prohibición al Referéndum -- sería una anomalía, puesto que la Ley Núm. 7-2017, *supra*, dispone para ambos eventos. Esto sería una lectura muy enrevesada.

**En este caso, contrario a lo esbozado por la mayoría de este Tribunal, no existe condición alguna que deba mover a esta Curia a variar el precedente previamente establecido.** Todo lo contrario. Es nuestra responsabilidad, como Alto Foro Judicial, otorgar cierto grado de certeza en cuanto a si, ante la eventualidad de los eventos electorales mencionados, se debe activar la J.E.A. como filtro para determinar si las agencias adscritas al Poder Ejecutivo pueden o no incurrir en gastos de fondos públicos en la publicación de anuncios; además de cerciorarse de que los referidos anuncios no estén matizados por posturas político-partidistas.

Por último, es menester señalar que en el caso de la ley en controversia, la Ley Núm. 7-2017, *supra*, esta prohibición se hace más patente si tomamos en cuenta que esta ley -- además de establecer los pormenores para la realización de los eventos electorales del 11 de junio y 8 de octubre de 2017 -- en su Art. XIII, Sec. 1, expresamente establece que las prohibiciones

y los delitos relacionados con la celebración de esta consulta, se regirán por las disposiciones establecidas en la Ley Núm. 78-2011; entiéndase, la vigente Ley electoral de Puerto Rico. Sobre este particular, se señala en el mencionado Art. XII, Sec. 1, lo siguiente:

> Las prohibiciones y los delitos relacionados con la celebración de esta consulta, se regirán por las disposiciones establecidas en la Ley 78-2011, según enmendada, conocida como la "Ley Electoral de Puerto Rico" y por la Ley 222-2011, conocida como la "Ley para la Fiscalización de Campañas Políticas en Puerto Rico", excepto cuando sean improcedentes o incompatibles con las disposiciones de esta Ley o cuando esta Ley dispone delito o penalidad específica. *Íd.*, a la pág. 47.

Demás está decir que, entre esas prohibiciones, en la Ley Núm. 78-2011 se encuentra la prohibición de incurrir en gastos para la compra de tiempo y espacio en los medios de comunicación del País, así como para la compra o distribución de materiales propagandísticos o promocionales con el propósito de exponer los programas, proyectos, logros, realizaciones, proyecciones y/o planes de las agencias adscritas al Poder Ejecutivo. Lo anterior, como ya hemos mencionado, con excepción de aquellos avisos y anuncios de prensa expresamente requeridos por ley y las campañas de la Compañía de Turismo, así como aquellos anuncios que sean utilizados para difundir información de interés público, urgencia o emergencia, los cuales sólo serán permitidos previa autorización de la C.E.E.

Además, al considerar la citada sección de ley, es menester tomar en consideración también el Art. 11.001 de la Ley Núm. 78-2011, 16 LPRA sec. 4211, el cual

dispone que "*[t]odo referéndum, consulta o plebiscito que se celebre en Puerto Rico se regirá por la ley especial que a tal fin se apruebe y por las disposiciones de este subtítulo en todo aquello necesario o pertinente para lo cual dicha ley especial no disponga*". Es decir, surge con meridiana claridad que la intención legislativa no fue tornar inoperante la Ley Núm. 78-2011, *supra*, sino que, por el contrario, el propio estatuto especial reconoce su eficacia. *Véase* además el Art. 18 del Código Civil de Puerto Rico, 31 LPRA sec. 18 ("*Las leyes que se refieren a la misma materia o cuyo objeto sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro*".).

Es, pues, a la luz de la normativa antes expuestas, que procedemos a disponer de las controversias ante nuestra consideración.

IV.

En el presente caso, el argumento principal de la Comisionada Electoral del P.N.P., el Procurador General, del Senado de Puerto Rico y de la Cámara de Representantes de Puerto Rico, es que, si bien el Estado no tiene un derecho de libertad de expresión, sí posee el deber y la facultad de comunicarse con

sus ciudadanos con el fin de informar sobre planes gubernamentales y demás asuntos relacionados. Bajo esta premisa, alegan que, contrario a lo resuelto en la Resolución de la C.E.E., las disposiciones contenidas en el Art. 12.001 de la Ley Núm. 78-2011, *supra*, son de aplicación exclusivamente durante el año en que se celebre una elección general. Además, argumentan que tanto el Referéndum como el Plebiscito son eventos no definidos como "*elección general*" y, por lo tanto, no ha de aplicarse la prohibición estatutaria durante la celebración de tales eventos. No le asiste la razón. Como hemos visto, similares planteamientos ya fueron atendidos y descartados por este Tribunal en *P.P.D. v. Gobernador II*, *supra*, y P.P.D. *v. Gobernador I, supra,* respectivamente.

Y es que la controversia ante nuestra consideración se ceñía a determinar si, fuera del año en el que se celebran las elecciones generales en nuestro País, -- y ante la celebración de un evento distinto a las referidas elecciones generales, por virtud de una ley especial -- cobraban vida las disposiciones de la veda electoral contenidas en el Art. 12.001 de la Ley Núm. 78-2011, *supra*. Ello, a los fines de que cualquier anuncio que el Estado pretendiera difundir por los medios de comunicación del País, fuese evaluado por el ente designado por la C.E.E., a saber, la J.E.A.

Conforme a la normativa antes expuesta -- la cual es una correcta y no amerita revocarse -- y en vista de que este caso no presenta elementos adicionales a los ya evaluados por este Tribunal en los casos anteriormente discutidos, entendemos que actuó correctamente la C.E.E. al hacer extensivas las disposiciones del Art. 12.001 de la Ley Núm. 78-2011, *supra*, a los eventos electorales a celebrarse en el País el 11 de junio de 2017 y, de ser necesario, al que se llevaría a cabo el 8 de octubre del mismo año, a saber, el Plebiscito y Referéndum, respectivamente. No podemos avalar que el Estado Libre Asociado, mediante anuncios por medios de difusión pública, y con fondos provenientes del Pueblo, interfiera con la prerrogativa de cada uno de nuestros individuos. El derecho al sufragio es inminente a la democracia misma y nos corresponde velar por que se ejerza de forma libre y voluntaria, en todo suceso electoral. Siendo ello así, es nuestro juicio que los errores señalados no se cometieron.

V.

Antes de finalizar, y en torno a uno de los planteamientos esbozados por el Procurador General, a los efectos de que aplicar la veda electoral tendría el efecto de socavar su facultad de comunicarse con el Pueblo en torno a asuntos gubernamentales, citamos "*in

*extenso"* lo dispuesto por este Tribunal en *P.P.D v. Gobernador II*, *supra*, a saber:

> Los derechos contenidos en la Carta de Derechos le[s] asisten a los individuos frente al Estado. Esos derechos no pueden extenderse a las expresiones del Gobierno porque los derechos están formulados en términos de lo que el Gobierno no puede hacer con relación a la expresión de las personas y no a la inversa. De ahí que el Gobierno no tiene un derecho constitucional a la libre expresión protegido. El problema ante nos implica el axioma básico de que el proceso decisional puertorriqueño responde en su realidad al postulado de igualdad inmerso en nuestra Constitución, el cual persigue lograr paridad económica entre los partidos políticos para la divulgación de ideas y mensajes en nuestro país. Véanse: *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984); *P.N.P. v. Tribunal Electoral*, supra, pág. 753. De ello resulta que existe un amplio poder en la limitación de la propaganda gubernamental.
>
> Por otro lado, no se veda completamente los anuncios gubernamentales, puesto que existe un mecanismo provisto por la C.E.E., que pasará juicio sobre el anuncio, para autorizarlos si ello corresponde. Dicha determinación está sujeta a revisión por parte de los tribunales. Recordemos que se trata de un interés apremiante en proteger el derecho constitucional de igualdad, que existe un interés en que el Estado y sus instrumentalidades [sic.] se mantengan neutrales, salvaguardando así el principio de libre selección del pueblo contenido en la Sec. 2 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1. P.P.D v. Gobernador II, a las págs. 924-925.

## VI.

Establecido lo anterior, y a modo de epílogo, hoy hubiésemos resuelto que, **al amparo del axioma de igualdad electoral en su vertiente de igualdad económica consagrado en la Constitución del Estado Libre Asociado de Puerto Rico**, *supra*, el Art. 12.001 de la Ley Núm. 78-2011, *supra*, es de aplicación en toda su extensión tanto al <u>Plebiscito</u> a celebrase

el 11 de junio de 2017, así como, de ser necesario, al <u>Referéndum</u> a llevarse a cabo el 8 de octubre del mismo año. Las elecciones generales, los plebiscitos y los referéndums tienen como denominador común el ejercicio del derecho constitucional al sufragio. Es nuestra función, como últimos intérpretes de la Constitución, procurar por la pureza de dichos procesos. A través de esta Opinión Disidente, lo hemos hecho en el día de hoy.

## VII.

Por los fundamentos antes expuestos, disentimos de lo resuelto por una mayoría de este Tribunal. Siendo ello así, hubiéramos confirmado la Resolución de la C.E.E. y, en su consecuencia, ordenado la constitución de la J.E.A.


                                        Ángel Colón Pérez
                                          Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Norma E. Burgos Andújar, Comisionada Electoral del Partido Nuevo Progresista<br><br>Recurridos<br><br>v.<br><br>Comisión Estatal de Elecciones, por conducto de su Presidenta, Liza García Vélez; Comisionado Electoral Interino del Partido Popular Democrático, Miguel Ríos Torres; Comisionada Electoral Designada del Partido Independentista Puertorriqueño, María de Lourdes Santiago<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico, por conducto de la Secretaria de Justicia, Hon. Wanda Vázquez Garced<br><br>Recurridos<br><br>Senado de Puerto Rico, por conducto de su Presidente, Hon. Thomas Rivera Schatz, y su Secretario Manuel Torres Nieves; Cámara de Representantes de Puerto Rico, por conducto de su Presidente Hon. Carlos Méndez Nuñez y su Secretaria Ayleen Figueroa Vázquez<br><br>Peticionarios | CT-2017-0002 | Certificación intrajurisdiccional |

RESOLUCIÓN
**Nunc Pro Tunc**

San Juan, Puerto Rico, a 20 de abril de 2017

Se enmienda **nunc pro tunc** la Opinión Disidente de 19 de abril de 2017 de la Juez Asociada señora Rodríguez Rodríguez a los efectos de corregir el último párrafo de la página 7, el cual debe leer de la siguiente manera:

Además, hay que resaltar que la mayoría revoca *P.P.D. v. Gobernador II*, sin que los peticionarios lo solicitaran. Por el contrario, éstos en varias ocasiones, tanto en su petición de certificación como en su alegato, reconocen la validez del caso como jurisprudencia vigente, más lo distinguen para sostener que la norma que allí se sentó no aplica a la situación planteada en este caso, **pero en ningún momento plantean que hay que revocarla y por qué.** Con su proceder, la mayoría transgrede el derecho de los recurridos a rebatir este planteamiento con sus propios fundamentos.[35] Es más, la mayoría adopta un curso de acción idéntico al que le critica al Tribunal que suscribió *P.P.D. v. Gobernador II, ante.* Estamos, francamente, ante argumentos o fundamentos estólidos.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

---

[35] Por otro lado, yo tenía entendido que el derecho es rogado y que planteamientos no argüidos por las partes, particularmente de índole constitucional, no serán atendidos por este Tribunal. Véase, por ejemplo, *ELA v. Northwestern Selecta*, 185 DPR 40 (2012); *Abengoa, S.A. v. American Intl. Ins.*, 176 DPR 512 (2009) (Es un principio de derecho arraigado en nuestro ordenamiento que, en apelación, nos abstendremos de adjudicar cuestiones no planteadas ante el Tribunal de Primera Instancia); *Echandi Otero v. Stewart Title*, 174 DPR 355 (2008) (Es norma vigente en nuestra jurisdicción que en apelación nos abstendremos de adjudicar cuestiones no planteadas ante el tribunal de instancia); *Delgado, Ex Parte*, 165 DPR 170 (2005); *Dorante v. Wrangler of P.R.*, 145 DPR 408, 443 (1998); *Trabal Morales v. Ruiz Rodríguez*, 125 DPR 340 (1990) (Así nos adherimos a la norma vigente de que en apelación nos abstendremos de adjudicar cuestiones no planteadas en primera instancia); *Sánchez v. Eastern Air Lines, Inc.*, 114 DPR 691 (1983); *Santiago Cruz v. Hernández Andino*, 91 DPR 709, 712 (1965). Por lo menos esa era la norma hasta hoy. A no ser que en un futuro, el vaivén de la marea requiera otro resultado cuando se escriba un nuevo capítulo de esta *Crónica*.